Joseph ACANFORA, III

v.

**BOARD OF EDUCATION OF MONT-
GOMERY COUNTY et al.**

Civ. No. 72–1136–Y.

United States District Court,
District of Maryland.

May 31, 1973.

Michael H. Gottesman, Darryl J. Anderson, Washington, D. C., Rob Ross Hendrickson, Baltimore, Md., for plaintiff.

Robert S. Bourbon, Rockville, Md., Alan I. Baron, Baltimore, Md., for defendants.

## MEMORANDUM OPINION AND ORDER

JOSEPH H. YOUNG, District Judge.

In an action brought pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1970) with jurisdiction founded on 28 U.S.C. §§ 1343(3), 1343(4), and 1331 (1962, 1966), plaintiff Joseph Acanfora, III, a teacher under contract with the Montgomery County Board of Education, alleges that his transfer on September 26, 1972, from a classroom teaching position to a non-teaching position in the Department of Curriculum and Instruction resulted from the discovery of plaintiff's admitted homosexuality and, as such, violated his constitutional rights.

Defendants include the Board of Education—as well as its President, Vice-President and members individually—the Superintendent of Schools, and the Deputy Superintendent of Schools, all of Montgomery County, Maryland.

Acanfora attended public schools in New Jersey, and, after graduation from high school, entered Penn State University in the autumn of 1968. Having initially pursued studies in meteorology, he switched to an education major in his

junior year, inclined more to a profession where he might work with people. Approximately at the same time, in the autumn of 1970, a homophile group was organized on campus, dedicated to ending discrimination against homosexuals and developing understanding of homosexuality. Acanfora, aware of his own homosexuality, joined and became Treasurer. In January, 1971, the group sought official recognition from the University. When the request was approved by the student government but denied by the administration, legal action followed in which Acanfora agreed to participate as a plaintiff, along with three other students. In the spring of 1971, during press interviews relating to the litigation, he stated publicly his homosexuality, and emphasized his belief in the unconstitutionality of the action of the University. While on assignment as a student teacher in the State College Area School District, Acanfora taught for six and one-half weeks before suspension by the Dean of the College of Education in late February, 1972, on the grounds of membership in the homophile organization. Following a new lawsuit, he was reinstated and completed his student teaching assignment, receiving a satisfactory evaluation. Plaintiff alleges he did not discuss homosexuality with students or colleagues, inside or outside the classroom.

In the spring of 1972, Acanfora applied for a teaching position with a number of different school systems, including Montgomery County. Following several interviews, he received an offer to teach eighth-grade earth science at Parkland Junior High School in Montgomery County. The offer was followed by a contract dated July 13, 1972 for the 1972–73 school year. Acanfora intentionally did not disclose his homosexuality during the interviews or in the official application form which provides for disclosure of membership in organizations and extracurricular activities, motivated by a desire to avoid rejection in light of his student-teaching experience in Pennsylvania.

During the spring of 1972, Acanfora also applied for certification to teach in Pennsylvania, a prerequisite to which is a finding of "good moral character." After a hearing at which plaintiff explained the professional relationship necessary between student and teacher, the intention never to discuss or encourage homosexuality, and the belief that homosexuals should gain legal rights and be free from specific hatred and fear, a special six-member panel split evenly and turned the matter over to the Pennsylvania Secretary of Education, John Pittenger. Plaintiff's exhibit 4 (PX–4).

On August 29, 1972, plaintiff began teaching at Parkland and initial reports from the resource teacher in science (equivalent to the Chairman of the Department), indicate that his performance was satisfactory. On September 22, 1972, Secretary Pittenger held a news conference in Harrisburg to announce that Acanfora would be certified in Pennsylvania. News reports of the tie-breaker appeared in the New York *Times* and Washington *Post*; and on September 26, 1972, having learned of the reports and consulted colleagues, Deputy Superintendent Dr. Donald Miedema in the absence of the Superintendent and with no opposition from the Board of Education transferred plaintiff to a non-teaching position, at no loss in salary, pending investigation.

The subsequent investigation can best be described as cursory, including a brief discussion with the psychiatrist for the school system. It is quite clear from the evidence that the essential reason for the transfer was that Acanfora is an admitted homosexual. Moreover, Dr. Miedema stated that the Board of Education would not knowingly hire a homosexual. That Acanfora is the only member of the Department of Curriculum and Instruction lacking more than a baccalaureate degree and several years professional experience is simply corroborative of this policy. The Board has in no way attacked Acanfora's classroom performance, nor has it charged Acanfora with bringing up the subject of

homosexuality in the school environment. The evidence is that he is competent and that he did not discuss his private life while at school.

The transfer, in addition to sparking this litigation, necessarily had an impact within the school community. Students and faculty separately petitioned for reinstatement. [Several teachers in the Montgomery County School System called plaintiff to encourage him, but noted that they would refrain, under the circumstances, from associating themselves with him and his cause.]

More significantly, as has been the pattern in controversial cases of recent years, plaintiff took his case to the people. He accepted offers, before and after the institution of this lawsuit on November 7, 1972, to discuss his case on a number of local and national television and radio shows, and with several newspapers, including:

1. A 15-minute interview on the Metropolitan Washington television program "Panorama" with Morry Povich, on October 26, 1972.

2. A 45-minute interview on the Metropolitan Washington WWDC radio program "Empathy" on November 1, 1972.

3. An interview on the educational television show "How Do Your Children Grow" on the Public Broadcasting System, the second week of November, 1972.

4. Participation in a 20-minute segment on the Columbia Broadcasting System national news review "60 Minutes" on February 25, 1973.

5. Telephone interviews with The Montgomery County *Sentinel* and The Montgomery County *Tribune*.

Transcripts of the two national television broadcasts are a part of the record. PX–7, 8.

The edition of "How Do Your Children Grow" is unique in that, moderated by psychiatrist Eda Leshan, it deals only peripherally with plaintiff's transfer and this litigation. Designed to educate children and parents in situations similar to that of the Acanfora family, the program gives thoughtful and serious insight into a problem which merits consideration. The segment on "60 Minutes", representative in subject matter of the other media coverage, albeit the most recent, focuses on the circumstances of this particular lawsuit.

In the course of his television exposure, Acanfora stresses again his disinclination to discuss matters of sexuality in the school environment, saying:

No, I have never brought my private life into the classroom—my sexuality or any other part of my private life into the classroom—or discussed sexuality with any of my students, either here or in Pennsylvania. And so, in fact, I would say I've never even talked to other teachers about it, and there was no way—known in the school system that I was gay until the school system decided to transfer me.

. . .

I never went out of my way to say, 'Here I am, a homosexual. What are you going to do with me?' Transcript of "60 Minutes", p. 12.

Neither is Acanfora inclined to hide his homosexuality.

Many of my friends have asked me why I'm doing this, why I just don't go some place and be a teacher and not let the gayness enter into it at all. But the fact is that I'm gay, just like the fact is that other teachers are straight or heterosexual. But I'm sure a heterosexual teacher isn't going to live his life a complete lie and hide what he is and I have no intentions of doing that either. I have every right to be what I am. I have every right to be a teacher. And I plan on doing both. *Ibid.* p. 8.

The defendants declined to participate in media coverage, or to alter the decision to deny plaintiff reinstatement and have refused to renew the 1972–73 contract.

The evidence further establishes that Parkland has an equal representation of sexes on the faculty and that a student in plaintiff's earth science class would

be under his tutelage for one fifty-minute period every day out of seven or eight class periods, including homeroom.

To complete the story, plaintiff recently became a member and delegate of the gay caucus of the National Education Association, in anticipation of the upcoming convention. He has attended meetings, but is not active, in the Washington Gay Activists Alliance, which pleaded his cause to the Montgomery County Board of Education. Finally, plaintiff has received his certification to teach in Maryland.

The Court appreciates the substantial expert evidence directed toward the effect of a known homosexual teacher on students in the circumstances of this case. The experts have impressive curricula vitae, which are a part of the record and will not be reproduced in detail here. (It is noteworthy that defendants did not contact their experts until shortly before trial.)

Dr. Reginald Spencer Lourie, a pediatrician and child psychiatrist, Professor of Child Health and Development at George Washington University Medical School and Director of Psychiatry at the Hillcrest Children's Center in Washington, emphasized the importance of the adolescent period as the stage at which a child overcomes the transitional homosexuality typical of the preadolescent period. For the population of children with bisexual tendencies, estimated at about 3%, it is a period of decision or choice. Convinced that a known homosexual teacher might serve as a model for such children, Dr. Lourie suggested that the removal of plaintiff would result in freer choice. An awareness that homosexuality may specifically cause mental and emotional problems in a culture which stigmatizes it underlies this assumption, and that of most experts, that prevention of homosexuality is a worthwhile goal. Dr. Lourie relied on his years of clinical and academic experience to support his argument that Acanfora might serve as a model for adolescents. He referred to no data on point, but noted that the theoretical de-

terminants of homosexuality are still substantially a matter of controversy. In the context of social reality, he analogized the removal of Acanfora from the classroom to a vaccination, admitting that one does not know precisely how many subjects are affected.

That there are other determinants of homosexuality and of mental and emotional disturbance, including some kinds of relations between heterosexual teachers and students, does not change the conclusion. Dr. Lourie mantained that one cannot escape the cultural definition of homosexuality as abnormal and the need to give children the utmost opportunity to be essentially normal in this important phase of life.

He narrowed his opinion, however, to known homosexuals who teach at the junior high school level, excluding private homosexuals, and known homosexuals who teach at the elementary or high school level. In other words, homosexuality does not preclude competence.

Dr. Felix P. Heald, Professor of Pediatrics at the University of Maryland Medical School, took essentially the same position for the same reasons. He suggested it would be impossible for the students to separate Acanfora's homosexual identity from his identity as an earth science teacher, and that Acanfora's presence would necessarily give rise to an undue influence, as would the presence of a heterosexual teacher who makes known facts concerning his private life. Dr. Heald, moreover, would draw the line at junior high and high school.

Dr. Stanford B. Friedman, Professor of Pediatrics and Psychiatry at the University of Rochester Medical School, and to assume a similar position at the University of Maryland as Director of the Human Development program, took a sharply different position. Noting the paucity of data on point, he opined that the influence of Acanfora would be marginal in the complex school and home environment of the student, and in addition felt that Acanfora's role as a teach-

er could realistically be distinguished from his role as a homosexual in terms of model choice. In other words, the real problem for Dr. Friedman is the projection of societal and parental fear on to the teacher. In support of his view, Dr. Friedman alluded to the greater importance of parent-child relationships in the early childhood years, demonstrated by the research of Dr. John Money. He furthermore attributed importance to the idea that any teacher may pose a risk to a particular portion of the student population. For example, a bisexual child might feel threatened by a very masculine · heterosexual teacher. As to the model theory, in addition to noting the existence of many other possible models, Dr. Friedman observed that the students might react that Acanfora is a good teacher in spite of his homosexuality because of the strong peer group and social pressure directed against this minority. Given that there is much to be learned about adolescent psychosexuality, he would not single out any one hypothesis as the more likely.

Dr. William R. Stayton, a psychologist, holder of a doctorate in theology, and instructor in Family Psychology at the University of Pennsylvania Medical School, also questioned the conclusion that Acanfora's presence would have a deleterious effect on students. From his experience in counseling persons regarding homosexuality, and given his acceptance of the view that persons are sexually predisposed by the age of five or six, Dr. Stayton adds that Acanfora would have a beneficial effect by serving as a role-model for homosexuals, aiding bisexuals in bringing into the open their problems with the appropriate counselor, and possibly resolving them. In other respects, he echoed in substance the opinion of Dr. Friedman.

Dr. John Money, Professor of Medical Psychology and Associate Professor of Pediatrics at the Johns Hopkins University Medical School, nationally known for his research on the etiology of homosexuality, or "the differentiation and dimorphism of gender identity," took the position that a person's sexual orientation is determined by the age of five or six. Dr. Money documented and explained his research in *Man & Woman, Boy & Girl*, Johns Hopkins University Press, Baltimore and London, 1972, with Anke A. Ehrhardt as co-author. Analogizing the development of sexual identity to a program or relay, Dr. Money traced the "message" from the genes and chromosomes, to the gonads, to the hormonal sections of the gonad cells, to the body and brain, and through the early childhood environment. As in the teaching of a language, each component plays its part. The child-rearing stage serves normally to show the child the importance of identifying with the parent of the same genetic sex and complementing the opposite. Dr. Money's findings are impressive and appear to expand the frontiers of knowledge of the differentiation of gender identity.

Corresponding to these findings is his opinion that, at the eighth grade level, Acanfora is not likely to cause a higher incidence of homosexuality. As to possible psychological consequences to bisexual and homosexual adolescents, Dr. Money began by noting that students already face a wide variety of imputs, including social, parental and peer group taboos on homosexuality. A bisexual may then possibly feel a sense of freedom to disclose his anxiety to a parent or physician and thereby gain the best chance to turn to heterosexuality. In addition, although a homosexual teacher is no more likely than a heterosexual to serve as a model generally, and less likely to be sexually attractive to a homosexual, Acanfora might serve the function of demonstrating to students that a homosexual can meaningfully participate in society. This is obviously constructive for homosexuals and also encourages a more reasonable attitude from heterosexuals.

In discussing the cause of homosexuality in prisons or schools for boys, Dr. Money stressed the importance of distinguishing homosexual behavior as a substitute for normal sexual drives from homosexuality as a gender identity. In

concluding an essential predisposition by the age of five, he directed his remarks toward the latter.

He also noted that from three to five per cent of the adult population is homosexual to varying significant degrees. This appears to be the rough consensus of experts.

Finally, counsel have supplied a copy of the *National Institute of Mental Health Task Force on Homosexuality: Final Report and Background Papers* (1972). Evelyn Hooker's article on *Homosexuality*, written in 1968, expresses the view that a combination of biological, cultural, psychodynamic, structural and situational factors cause and impinge on homosexuality. Professor Edwin M. Schur in his article, *Sociocultural Factors in Homosexual Behavior*, underlines those titled factors. The Task Force also includes an earlier article of Dr. Money, along with a supplement from his latest book. The Task Force recommends a thoughtful reassessment of employment policies, but does not specifically deal with the case of homosexual teachers. There were several dissents to the recommendations generally on the ground that not enough is known about the causes, characteristics and effects of different kinds of homosexual behavior to reach reasoned scientific conclusions.

Upon the above expert evidence, while Dr. Money's research and opinion deserve special recognition, it would be premature to state definitively that Acanfora's presence in the classroom will have no deleterious effect. It is fair to state that factors present in the embryonic and early childhood stages appear to have the greatest impact, but that the book is by no means closed on the possible behavioral and sociocultural impact stressed by Drs. Lourie and Heald and Professor Schur. A finding that sexual orientation is in large part predisposed by age five or six does not preclude an incremental effect of a teacher on a bisexual adolescent. Although speculation has drifted to the numerous possible positive and negative effects different kinds of teachers may have on particular students, the Court cannot ignore the specific danger noted by defendant's experts. The danger does not seem as great or as likely as defendants have assumed, but it is not illusory. In conjunction with the attitudes of parents and interested citizens in the school community, the instruction of an eighth-grade earth science class by a known homosexual poses sensitive problems, both for relationships among students and between students and parents.

## I.

■ The Superintendent of Schools in each Maryland county may transfer a teacher as the needs of the school system require, pursuant to Article 77, § 62 of the Maryland Annotated Code (1969 Replacement Volume). While the informed judgments of educational administrators usually deserve due deference, see San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the law does not permit the impairment of constitutionally protected interests. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 723 (1972), Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). A state may not condition government employment on the surrender of a constitutional freedom. Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). It is "self-evident" in this Circuit that objections by a Board of Education to the exercise of personal and associational liberty, for example with respect to civil rights activism, would not justify non-renewal of a contract so long as the activities do not interfere with the educational process. Johnson v. Branch, 364 F.2d 177 (4th Cir. 1966). And it is no defense that the Board merely transferred Acanfora, for the measurement of abridgment of constitutional rights is not confined to dollars and cents. To rule otherwise would facilitate subtle circumvention of the law so carefully de-

veloped by the highest court of this land.

## II.

The guarantee of liberty in the Fourteenth Amendment is greater than the sum of particular rights guaranteed in the first eight amendments. The substantive doctrine of due process, advancing this proposition, originated in cases sustaining the individual right to contract and to work against unreasonable state legislation. Allgeyer v. Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897); Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905); Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436 (1908); Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441 (1915); Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923); See Jacobson, Federalism and Property Rights, 15 N.Y.U.L.Q. Rev. 319 (1938). Opposed to this doctrine is the thought that the Constitution does not dictate any particular economic theory, that courts should not sit as "super legislatures," subjectively deciding on fundamental fairness. This also interrupted, but did not destroy, the growth of the idea that in matters touching personal liberty, the Fourteenth Amendment expresses an integral philosophy of liberal democracy, not simply an amalgam of differentiated clauses. Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1938); Griswold v. Connecticut, 381 U.S. 479, 85 S. Ct. 1678, 14 L.Ed.2d 510 (1965); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L. Ed.2d 147 (1973). The quest for judicial objectivism, proposed as most nearly attainable by the incorporation of the *particular* language of the first eight amendments by the Fourteenth, proved illusory, for that language itself is subject to varying interpretation. See *Griswold, supra* (Harlan, J., concurring opinion) and cases there discussed. See, for example, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). While a court must necessarily bear a sense of proportion, with respect to precedent and social mores, a rigidly restrictive theory of interpretation, avoiding the dangers of judicial activism, is open to criticism for abdication of the duty to expound the Constitution.

In this spirit, the Supreme Court has created a sphere of protectable interests, including, but not limited to, the interests specifically designated in the first eight amendments, as "essential to the orderly pursuit of happiness by free men." *Meyer, supra,* 262 U.S., at 399, 43 S.Ct., at 626. It is noteworthy that this sphere includes the right to pursue a career, *Meyer, supra;* the right to freely associate for the promotion of political and social ideas, Wiemann v. Updegraff, 344 U.S. 183, 73 S. Ct. 215, 97 L.Ed. 216 (1952); Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); *Shelton, supra; Keyishian, supra;* Bruns v. Pomerleau, 319 F.Supp. 58 (D.Md. 1970); the right to procreate, Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (Stone, C. J., concurring opinion); the right to marital privacy and choice, *Griswold, supra; Loving, supra;* and the right to control matters affecting reproduction, regardless of marital status, *Eisenstadt, supra; Roe, supra.* State action impinging on a protectable interest draws especially careful judicial review.

As autonomous and rational beings, individuals are capable of reasoned decisions in pursuit of chosen goals. Given man's imperfect knowledge, full freedom of thought and association is imperative for individual self-development and social progress. So long as the freedoms of others are not affected, a government intended to promote the life, liberty and

happiness of its citizens must abstain from interference with individual pursuits, no matter how unorthodox or repulsive to the majority. As social animals, individuals necessarily place importance on friendships and relationships of trust. Hence the development of a right of privacy. *Griswold, Katz, Eisenstadt, Roe, supra.*

> Great concepts like . . . 'liberty' . . . were purposely left to gather meaning from experience. For they relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged. National Mutual Ins. Co. v. Tidewater Transfer Co., Inc., 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1948) (Frankfurter, J., dissenting opinion. See *Roe, supra.*) (Stewart, J., concurring opinion.)

In this context, the time has come today for private, consenting, adult homosexuality to enter the sphere of constitutionally protectable interests. Intolerance of the unconventional halts the growth of liberty.

This case would be different if homosexuals were generically psychotic or suffering from such emotional disturbance as to impair everyday functioning. It is debated whether homosexuality is a sexual character disorder resulting from abnormal development. See Note, Government-Created Employment Disabilities of the Homosexual, 82 Harv.L.Rev. 1738, 1743 (1969), (cited hereafter as Disabilities) ; Fisher, The Sex Offender Provisions of the New Maryland Criminal Code: Should Private Consenting Homosexual Behavior be Excluded. 30 Md.L.Rev. 91, 100–02 (1970) (cited hereafter as Sex Offender Provisions). It is undisputed, however, that homosexuality *per se* does not preclude successful job performance. See Norton v. Macy, 135 U.S.App.D.C. 214, 417 F.2d 1161 (1969), Morrison v. State Board of Education, 1 Cal.3d 214, 82 Cal.Rptr. 175, 461 P.2d 375 (1969), In re Labady, 326 F.Supp. 924 (S.D.N.Y.1971), *Disabili-*

*ties, supra; Sex Offender Provisions, supra.*

This case would likewise be different if homosexuality presented a threat to the survival of the species.

Accordingly, it bears restatement that

> . . . an opinion on a point of conduct, not supported by reasons, can only be one's personal preference, and if the reasons when given are a mere appeal to a similar preference felt by other people, it is still only many people's liking instead of one. J. S. Mill, "On Liberty" 132 (reprinted in *The Six Great Humanistic Essays of John Stuart Mill,* Washington Square Press, New York, 1963)

Two important recent studies reached similar conclusions. The Wolfenden Report, prepared for the British Parliament by the "Committee on Homosexual Offenses and Prostitution" (1957) and enacted into law in 1967, dictates that private adult homosexuality not be a criminal offense.

> There remains one additional counter argument which we believe to be decisive, namely, the importance which society and the law ought to give to individual freedom of choice and action in matters of private morality. Unless a deliberate attempt is to be made by society, acting through the agency of the law, to equate the sphere of crime with that of sin, there must remain a realm of private morality and immorality which is, in brief and crude terms, not the law's business. Wolfenden Report, at 48.

On a broader scale, a study of American penal law undertaken by the American Law Institute suggested exclusion from criminal law of all sexual practices not involving force, adult corruption of minors, or public offense. Absent harm to the secular community, this area is of distinct concern to spiritual authorities, in conformity with the spirit of separation of church and state. See Model Penal Code § 207.5(1), Comment (Tent. Draft No. 4, 1955). Illinois and Connecticut were first to adopt this posi-

tion, followed in substance by New York. See *Sex Offender Provisions, supra,* at 104–05.

The Court is cognizant that numerous states prohibit private, consenting homosexuality. Maryland arguably is among them, prescribing criminal sanctions for sodomy and unnatural or perverted sexual practices. Md.Ann.Code Art. 27, § 554 (1971 Replacement Volume). It is of greater import, however, that despite the substantial activity, no reported case reveals the enforcement of this law against private homosexuality. See *Sex Offender Provisions, supra,* at 95–97. Such lack of enforcement is not peculiar to Maryland. Project, the Consenting Adult Homosexual and the Law: An Empirical Study of Enforcement and Administration in Los Angeles County, 13 U.C.L.A. L.Rev. 643, 688–89 (1966); Ploscowe, Sex Offenses in the New Penal Law, 32 Brooklyn L.Rev. 274, 284 (1966). The sweeping invasion of privacy which would necessarily accompany enforcement explains this phenomenon, raising severe questions regarding the inner morality of a law beset by internal contradictions and a lack of congruence between official action and declared rule. See L. Fuller, The Morality of Law, 65–70, 81–90, Yale University Press (Rev.Ed.1969). Assuming further no significant decline in homosexuality since the famous Kinsey report, the law raises additional concern over the impossibility of compliance, contributing to contempt for the legal system. See L. Fuller, op. cit. 70–79. A. Kinsey, W. Pomeroy, and C. Martin, Sexual Behavior in the Human Male (1948), *Morrison, supra.*

It is no less true now than when written in 1859 that although society no longer puts heretics and sinners to death, nor does it act so vigorously as to stamp them out, it cannot flatter itself as free from the stain of legal persecution. The *chief* harm in these laws is the perpetuation of social stigma, cramping mental development, cowing reason, and repressing human expression for fear of social disfavor. See J. S. Mill, op. cit. 154–58.

Such are the differences in the nature of human beings that unless there is a corresponding diversity in their modes of life, they neither obtain their fair share of happiness nor grow up to the mental, moral and aesthetic stature of which their nature is capable. *Ibid.* 192. Preservation of the *atmosphere* of freedom in an imperfect world is furthermore essential to the advancement of mankind. *Ibid.* 181. The practical application of these principles is most urgent for those who differ from the prevailing mode, for it is the majority which defines common conceptions and morality.

### III.

Corollary to the proposition that ordered liberty protects private, consenting, adult homosexuality is the notion that discrimination directed at such activity is "suspect" under the Equal Protection clause of the Fourteenth Amendment.

Should the conclusion reached in Section II of this opinion be incorrect, however, it would be necessary to consider independently the application of the law of equal protection.

Speaking for four members of the Court, Mr. Justice Brennan recently announced that sex is a "suspect" classification, arguably joined by Mr. Justice Stewart in a brief concurring opinion. Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). While from this, it does not necessarily follow that sexual preference is similarly "suspect" as a classification, the broad thrust of the opinion of the Court substantially supports extrapolation,

. . . since sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate 'the basic concept of our system that legal burdens

should bear some relationship to individual responsibility' . . . .
*And what differentiates sex from such nonsuspect statutes as intelligence or physical disability, . . . is that the sex characteristic frequently bears no relation to ability to perform or contribute to society.* (Emphasis supplied, citation omitted.) *Frontiero, supra,* 93 S.Ct. at 1770.

Assuming, however, that the sense of history relied on by Mr. Justice Brennan to supplement this analysis would not support such an extension of the law, it is appropriate to restate the more usual standard of equal protection, that, at the very least,

"A classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object [of the state action], so that all persons similarly circumstanced are treated alike." Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

### IV.

The principles basic to liberty are appropriate to the mature, reasoning individual. Society, however, has an interest in protecting children from themselves as they develop their ability to think and act independently in the surrounding culture. For the purpose of education, responsible officials and parents necessarily have considerable discretion.

It is true that state control of education runs a considerable danger of yielding to the dictates of the majority on matters deserving full academic discussion. Thus, the Supreme Court has found it necessary to protect freedom of academic discussion and expression of minority views on numerous occasions in recent years, especially in political matters. *Sweezy, supra; Keyishian, supra;* Tinker v. Des Moines Independent School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). On matters beyond the sphere of academic or political expression, the Court indicated that speech would be protected absent a deleterious or disruptive effect on children or the educational process. *Pickering, supra.*

At the first level of analysis, it is entirely clear that if Acanfora's homosexuality had remained undiscovered to the general school community, there could have been no deleterious effect. For example, if Acanfora had admitted confidentially on his application that he is a homosexual, but that he had no intention of publicizing the fact, denial of employment for that reason would be unconstitutional. In this context, the Board of Education's policy of not knowingly employing any homosexuals is objectionable.

At the second level of analysis, the Court must consider the legitimacy of the transfer on September 26, in the context of the subsequent cursory investigation and the failure to provide first an administrative hearing.

A state educational institution must afford a transfer hearing to a teacher whom it has hired under formal contract with the "clearly implied promise" of continued employment in a classroom teaching capacity for the duration of that contract. See Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), Connell v. Higginbotham, 403 U.S. 207, 208, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971). It must likewise afford a hearing in order that the appellant might refute charges which tend to damage his reputation in the community. *Roth, supra.* While the facts here are undisputed, the implications are open to controversy.

At this time, however, a remand for administrative procedural due process would be pointless, as the substantive rift has widened and the parties have shifted their attention to the plenary hearing in this forum. The prejudgment of the controversy by defendants casts doubt on the prospective fairness of such a procedure. Cf. Kelly v. Board of Education of the City of Nashville, 159 F.Supp. 272 (M.D.Tenn.1958), Amos

Treat & Co. v. Securities and Exchange Commission, 113 U.S.App.D.C. 100, 306 F.2d 260 (1962); see the discussion in Gibson v. Berryhill, 411 U.S. 564, 93 S. Ct. 1689, 36 L.Ed.2d 488 (1973).

■ The doctrine requiring exhaustion of administrative remedies by a plaintiff does not apply to this case. The cognate argument belatedly made by the defendants, that the plaintiff is estopped from raising procedural objections because of his failure to take advantage of an administrative complaint procedure operative for involuntary transfers, is insufficient since the burden under *Roth* is not on the teacher. Moreover, the effectiveness of this procedure is questionable. Defendants never apprised plaintiff of its existence and did not appear to be aware of it until the filing of post trial briefs.

As the matter stood on September 26, 1972, the transfer was occasioned by the fact that Acanfora became a *known* homosexual. The cause of the publicity was, in the immediate sense, independent of plaintiff's speech and action. There is no evidence that during the period of his employment prior to transfer, Acanfora made his homosexuality known to the school community.

While it might be argued that the newspaper reports can be traced ultimately to Acanfora's decision to join the homophile organization at Penn State as first cause, this Court is unwilling to penalize plaintiff for lawful membership in a college student group which led to publicized legal entanglement over certification in Pennsylvania. In other words, a different standard will apply in this case to plaintiff's speech and action after his college graduation and the signing of the contract to teach.

## V.

The analysis must finally stretch to the post-transfer publicity in which plaintiff had a role. If private, consenting adult homosexuality is "protectable," it follows from the First Amendment that public speech, organization and assembly in support of that goal by ordinary citizens is also protectable. This syllogism does not, however, encompass the definition of the boundaries of protectable speech and association of teachers, who hold a special position of trust and responsibility in the educational process.

The exchange of views in the market place of ideas occupies the most brilliant orbit in the constitutional solar system. New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Political thought is especially fundamental, and

> may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with [things] as they are, or even stirs people to anger.

> Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949).

Nor does freedom of speech stop at the schoolhouse door.

> . . . in our system undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom or expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken in class, in the lunchroom, or on the campus, that deviates from the views of another person, may start an argument or cause a disturbance. . . . But our Constitution says we must take this risk.

> *Tinker, supra,* 393 U.S., at 508, 89 S. Ct., at 737.

See also James v. Board of Education, 461 F.2d 566 (2d Cir. 1972); Massie v. Henry, 455 F.2d 779 (4th Cir. 1972); *Cohen, supra.*

With this goes the caveat that,

> . . . the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection

with regulation of the speech of citizenry in general.

*Pikering, supra,* 391 U.S., at 568, 88 S.Ct., at 1734.

Otherwise stated, the Board of Education has an interest in the regulation of activity detrimental to the educational process. Cf. Quarterman v. Byrd, 453 F.2d 54 (4th Cir. 1971).

■ Indeed, freedom of speech is subject to reasonable regulation as to time, manner and place; and speech which is "inseparable" from action does not enjoy the same degree of protectability.

Thus, the law does not protect "fighting words." Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L. Ed. 1031 (1942). The law permits reasonable regulation of political and labor demonstrations, United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L. Ed.2d 182 (1968), Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1967), Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), Giboney v. Empire Storage Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949), See Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1941), Amalgamated Food Employees Local Union 590 v. Logan, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (Douglas, J., concurring opinion); reasonable control of noise, Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949); and reasonable allocation of the scarce resources of public broadcasting. Red Lion Broadcasting Co. v. Federal Communications Commission, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

Ever since Justice Oliver Wendell Holmes' classic illustration of the shout of "fire" in a crowded theater, the courts have struggled with the limits of the First Amendment and/or the boundary between speech and action. See Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919). Despite the apparent lack of connection, it is perhaps noteworthy that the "panic" of the crowded theater in the illustration has some similarity to the reaction of parts of the school community in this case.

The instruction of children carries with it special responsibilities, whether a teacher be heterosexual or homosexual. The conduct of private life necessarily reflects on the life in public. There exists then not only a right of privacy, so strongly urged by the plaintiff, but also a duty of privacy. It is conceded that it would be improper for any teacher to discuss his sex life in the school environment. Plaintiff has taken the position that he has not engaged, and will not engage, in such a discussion. The more difficult question is the limitation on the outside activities of the plaintiff.

An evaluation of Acanfora's public appearances in the context of the educational process must recognize to a degree that homosexuality is *sui generis* in contemporary America. First of all, the subject of homosexuality is peculiarly sensitive and of special concern to the American family. This is not a question of race relations (*Johnson, supra*), of the wearing of armbands (*Tinker, James, supra*), of long hair (*Massie, supra*), or of the allocation of educational funds (*Pickering, supra*). The consensus of the experts and of the Task Force of the National Institute of Mental Health is that prevention of homosexuality is a desirable goal, essentially because of the cultural stigma and repression for which it is the target. Even assuming the antipathy of parents, and of school officials, to be unreasonably intolerant, the Court notes that immediate aggravation of anxiety and conflicts between students, parents, faculty and officials varies directly with the notoriety of this case and detracts from the educational process. Secondly, a difference of expert opinion exists as to the influence of a known homosexual teaching in junior high school on the differentiation of gender identity, especially

of bisexuals. Thus, the fear of parents cannot be definitively characterized as "undifferentiated apprehension or fear of disturbance." *Tinker, supra.*

In a series of cases relating to the advocacy of revolution and/or violence by ordinary citizens, the Supreme Court has drawn a boundary in an analogously perplexing area of the law. After first taking the position, in essence, that active advocacy, as opposed to discussion, of violent revolution is subject to criminal sanctions—that the government need not wait until the *putsch* is about to be executed, the plans have been laid, and the signal executed—the court modified its holding to distinguish advocacy of abstract doctrine from advocacy in preparation for future violent action, or exhortation to immediate action. Compare Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) with Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). The urging must be to do, rather than believe in, before the state may intervene. In Brandenburg v. Ohio, *supra,* the court restated the doctrine in broad language,

> . . . that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.

395 U.S., at 447, 89 S.Ct. at 1829.

■ As a result of the distinguishing obligations which a person assumes upon signing a contract to teach children, the standard must shift to accord with the goals of the educational process. The question becomes whether the speech is likely to incite or produce imminent effects deleterious to the educational process. Such speech is not within the bounds of the "protectable" and the Board of Education is not precluded from taking reasonable action with respect to it.

It is true that freedom of speech may best serve the political process, and political discussion within the educational process, when it induces a condition of unrest, stirs people to anger, or inspires fear. *Terminiello, Johnson, Tinker, supra.* It is likewise true that the promotion of legal rights for homosexuals is a political undertaking. When undertaken publicly by a known homosexual teacher, however, upon the evidence presented in this case, it does not best serve the purposes of sexual adjustment, maturation and student-parent relationships in the educational context. These questions are charged with emotion and of such a delicate and sensitive nature that the injection of controversy tends to breed misunderstanding, alarm and anxiety.

■ As indicated earlier, mere knowledge that a teacher is homosexual is not sufficient to justify transfer or dismissal. In addition, the homosexual teacher need not become a recluse, nor need he lie about himself. Like any other teacher, he may attend public gatherings and associate with whomever he chooses. But a sense of discretion and self-restraint must guide him to avoid speech or activity likely to spark the added public controversy which detracts from the educational process.

■ This case does not involve an admission of homosexuality in response to an individual question put to the plaintiff, but rather the repeated, unnecessary, appearances on local and especially national news media. Granted that plaintiff did not *advocate* homosexuality, but concentrated on his opinion of the injustice and discrimination practiced against homosexuals in this country, his appearances nevertheless inevitably sparked additional controversy regarding the subject of homosexuality and the classroom. The point is that to some extent every teacher has to go out of his way to hide his private life, and that a homosexual teacher is not at liberty to ignore or hold in contempt the sensitivity of the subject to the school

community. Indeed, it is the very lack of necessity or appropriateness for the public appearances which contributes substantially to their inflammatory character, and hence, to the likelihood of incitement or production of effects deleterious to the educational process.

The plaintiff advances the proposition, not without some grounds, that his public appearances amount to no more than a *defense* of his legal rights against the arbitrary action of the defendants. As indicated earlier, the instantaneous and visceral reaction of the defendants merits no praise. While neither of the two sides may claim a monopoly on the proper exercise of discretion, plaintiff's offense lies in his exceeding the bounds of reasonable self-defense.

It was not reasonably necessary to plaintiff's defense, to try his case to the public. The concept of self-defense sweeps broadly across the common law. Elementary tort and criminal law dictates that one may take reasonable steps to defend his person and property against attack. See Baltimore Transit Co. v. Faulkner, 179 Md. 598, 20 A.2d 485 (1941), Maddran v. Mullendore, 206 Md. 291, 111 A.2d 608 (1955), Brown v. State, 6 Md.App. 631, 252 A.2d 887 (1969).

The decision to transfer plaintiff without a hearing is, at heart, the functional equivalent of an injury inflicted upon plaintiff's reputation, an implicit allegation that his homosexuality determines unfitness to teach. To defend reputation, one may publish, *in an appropriate manner and to the appropriate parties,* anything which *reasonably appears to be necessary* to respond to the defamation of another, including, of course, consultation of an attorney. See Prosser, Law of Torts § 115, p. 786 (4th Ed. 1971). As Professor Prosser carefully indicates, however, the privilege is subject to abuse,

. . . And this is as it should be. If the communication is made, not at all for the purpose of protecting inter-

ests legally cognizable, nor in the performance of a duty which the law encourages, 'the pretense under which it is made, instead of furnishing a defense, will aggravate the case. . . . .' Orrison v. Vance, 262 Md. 285, 294, 277 A.2d 573 (1971), quoting from 1 Harper and James, The Law of Torts § 5.27, p. 452 (1956).

The arbitrary transfer of September 26, 1972, without legal justification as matters then stood, did not excuse the plaintiff from exercising discretion in his public life. Nor did the alleged arbitrary action necessarily render "protectable" subsequent speech or conduct which otherwise would not be so protected.

The substance of plaintiff's remarks on "60 Minutes" had an element of sensationalism. Furthermore, the design and function of the programs in which plaintiff participated tended to spark controversy. Quite obviously, the television and radio audience was in no position to give legitimate assistance. Plaintiff's actions were not reasonably necessary for self-defense. Indeed the media appearances were likely to incite or produce imminent effects deleterious to the educational process, and "instead of furnishing a defense, [aggravated] the case."

It is noteworthy that the fault in plaintiff's public appearances does not lie with the possibility of arousing sympathy to the prejudice of a fair trial, but rather with an indifference to the bounds of propriety which of necessity must govern the behavior of any teacher, regardless of sexual tendencies.

Accordingly, despite the initial transgression of the defendants, the Court can not grant plaintiff the relief for which he prays. Plaintiff's public activities as herein described are not "protectable" and the Court cannot at this time characterize the refusal to reinstate plaintiff or renew his contract as arbitrary or capricious under either the First Amendment or the Equal Protection Clause of the Fourteenth Amendment.