Penn-Delco School District, Petitioner *v.* Thomas Urso, Respondent.

502

Argued December 8, 1977, before Judges WILKIN-SON, JR., ROGERS and DISALLE, sitting as a panel of three.

*Melvin G. Levy,* with him, of counsel, *Levy and Levy,* for petitioner.

*Andrew J. Forbes,* with him *Cramp, D'Iorio, Mc-Conchie, Forbes and Surrick,* P.C., for respondent.

OPINION BY JUDGE WILKINSON, JR., February 8, 1978:

The Penn-Delco School District (District) appeals an order of the Acting Secretary of Education (Secretary) sustaining the appeal of Respondent, a professional employee, who was dismissed by the Board of Directors of the District (Board) on grounds of immorality.

There is no serious contention Respondent was not properly dismissed by the Board pursuant to procedures outlined in the Public School Code of 1949 (Code)[1] following a timely notice and hearing held February 3, 4 and 5, 1976. What is seriously disputed is whether the Board or Secretary properly defined and applied the standard of immorality used in the Code and whether evidence adduced at the hearing supports the Board's finding of immorality.

The charges against Respondent stem from two incidents involving two female students who were assigned to Respondent's classes. The first incident occurred in March of 1975. There is no material dispute as to the facts. Respondent, who knew the student both as a teacher and as a faculty advisor to the school newspaper, called the student, a 17-year-old senior, away from her newspaper assignment and into the corridor and offered, since it was her birthday, to "spank" her. The student, who at that time assumed Respondent was joking became concerned that he was seriously making an overture of an explicitly sexual nature when Respondent repeated his offer in a telephone conversation that same day. As

---

[1] Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §§1-101 et seq.

a result, she immediately reported this incident to another teacher and thereafter to the school principal. At that time the student agreed that the incident should be treated as a joke and ignored; the principal advised her that she should report any similar overtures made by the Respondent in the future. Over the ensuing two weeks, Respondent sought this student outside of the classroom and attempted on two separate occasions to engage her in discussions about spanking.[2] On the occasion of the last incident, a con-

---

[2] The witness testified as follows:

Q. Would you please tell us what it was that took place?

A. Well, I was in the newspaper room typing, and I had finished my assignment, and Mr. Urso asked to see me outside, and we got outside, and he said he had heard it was my birthday, and that he wanted to know when he could spank me for my birthday.

And, I thought he was joking or kidding around or something; and, I remarked something like, . . . 'Oh, I'm too big for that, too old for that.' It was left at that, and I went to work. And, then when I got to work—

Q. Where is work at that time?

A. Okay. It was in the print shop for the Penn-Delco School District.

. . . .

A. I got to work. I have no idea how long I had been there, and my boss, Miss Imburgia, received a phone call from Mr. Urso, and he . . . asked to talk to me, saying something about he wanted to wish me a happy birthday.

So, I got on the phone, and he asked me, he began to talk about when could he spank me for my birthday. And so, . . . I said, no, I didn't think so; and from the answers I gave, I assumed he was joking, and Mr. Urso also assumed that, because he said to me that, no, he was very serious, he wanted to know when could he spank me for my birthday.

. . . .

Q. Did you have later contact with Mr. Urso?

A. Yes. . . . It was about a week later, and I was leaving the newspaper room to go to work, heading down

ference was held with Respondent, school administrators and the girl's parents. Respondent admitted that he knew the student to be extremely shy and easily embarrassed and upset and further that he continued making these overtures knowing that they had caused the student to become nervous and upset. He told her parents and testified at the hearing that he had acted

toward the band room, and Mr. Urso approached me in the hall, and said, when, he wanted to know when he could spank me for my birthday. And, I was upset, and he asked me why I was upset and why I was avoiding him, because I had been avoiding him since the phone call; and, he wanted to know what the problem was and what was wrong.

So, again, I said practically nothing, because I didn't know what to say, and he said he wanted to see me some day, would I come to his room.

. . . .

Q. Was there any further conversation on Mr. Urso's part at any time about any spanking?

A. About a week after that incident, he approached me again, he caught up with me in the band room, and I was on my way to work, and there were a few people down front, and we were in the back of the room, and he started to talk about the spanking again.

And, again, I was upset and he asked me why was I upset, and why was I so nervous. And, there was no reason to be nervous around him. And, he said to me, 'Didn't your boyfriend ever spank you?'

And, I said no. And he said, 'Oh, well, you don't know what you are missing.' And, I don't know how the conversation ended. . . .

Q. Now, at any time . . . did you report any of this to any member of the faculty or administration?

A. Yes, sir, I did.

Q. What did you do?

A. After the phone call, I went in the next morning and talked to the teacher, Mr. DeAugustine, and he called Mr. Zechman, after we had finished talking, made an appointment for me to go up to see him.

Q. Mr. Zechman is the school principal?

A. Yes, that's right.

to "motivate" her as a pedagogical technique. Respondent apologized to the parents *and was warned by school administrators not to engage in similar conversations with students in the future.*

The second incident occurred in December 1975 with a 15-year-old 10th grade student in Respondent's English Composition and Rhetoric Class. Respondent confiscated an admittedly embarrassing and incriminating note the student was writing during class to a girlfriend. The student asked Respondent to meet her after class concerning the return of the note and not to read it, to which Respondent agreed on both counts. Prior to the meeting Respondent read the note; he also made a photocopy. During the meeting, possible forms of discipline for writing the note in class were discussed. Both student and teacher testified at the hearing before the Board that Respondent suggested that the student wear a dress to school as part of her punishment. Both testified that the subject of spanking within a sexual context and other matters of an explicitly sexual nature were discussed.[3] On the sub-

---

[3] This witness testified concerning the incident:

Q. Now . . . directing your attention to December 1, 1975, can you recall an incident occurring on that date with Mr. Urso?

. . . .

A. I had written a letter in his class, and he came back and confiscated it, and I asked to talk to him after school.

. . . .

A. I asked him where he was going to be after school. He said the publications office. So, after school . . . I went in and he told me to sit down, and he started talking. And, he said he wanted to think of a juvenile punishment for something that I did, and he said, do you have any ideas.

I said, make me write something. He said, that is not good enough. I said, keep me in detention. He said, that's not good enough, either. And, then he took me outside and

ject of spanking, Respondent admitted saying to the student, "It's not such a bad idea." At this meeting, Respondent returned the original of the note but informed the student he had made a copy which he was

he was standing there, and he said, I want to think of something else.

. . . .

He said, I want to do something else, very distasteful to you. I said, what is that. He said, I want you to wear a dress. I said, wear a dress? He said yes. I said, I don't want to wear a dress. He said, why?

I said, because I have skinny legs. He said, you have a very cute figure. He said, I want to have a very safe place and time so I can discipline you. He said, I am not going now to do this. He said, how about my house on Wednesday.

Q. What was it he suggested be done at the house on Wednesday?

A. He suggested that he was going to spank me.

Q. Was that the first time he mentioned that he was going to spank you?

A. Yes.

Q. After he said how about his house on Wednesday, what was said next?

A. I said, 'Your house?'

. . . . .

Q. Now, what was the last thing that you stated that he said to you before this? What was it he said?

A. He said he was crazy and he did a lot of crazy things in his life, but he is not that crazy to do anything to me.

Q. This was all in the same publications office?

A. Well, yeah, but we had gotten up and left.

Q. Why did you get up and leave?

A. Because someone came in the room.

Q. Where did you go to when you left?

A. Right outside.

Q. And, did the conversation continue then outside of the publications office?

A. Yes.

Q. In the hallway?

A. Yes.

considering sending to her father. The student reported this incident to the school principal. As a result of this incident the student was permitted to transfer to an English class taught by another teacher.

Q.  And, how long were you standing there in the hallway with him?

A.  About ten, maybe fifteen minutes.

Q.  And, how many times during this conversation did he discuss spanking with you?

A.  Oh, twice.

Q.  When was the second time?

A.  When we were out in the hall. The first time, I forgot to mention, was when we were in the room; he said how about if I give you a spanking. I started laughing. I said, 'What are you going to do, put me over your knee?' And, he said, yeah. He said, 'Would you have any objections about that?'

And, I thought he was going to take me over to the office and hit me with the paddle; and, I said no.

So, we got outside, and he started talking about wearing a dress, and then I started thinking, you know—

Q.  Thinking what?

. . . .

Q.  That he was serious?

A.  Yes.

Q.  What did he say he was going to do with the letter?

A.  He said I didn't—he pulled out an envelope when we were in the room, and he said, he pulled it out and made a carbon copy of it, and he had the other letter in his hand.

He said if I didn't do everything he said to do he was going to send the note to my father.

. . . .

Q.  Did you mention this incident to anybody at home?

A.  Yes.

. . . .

Q.  What did you tell your brother?

A.  I told him exactly what had happened.

. . . .

Q.  What did you next do, Eileen?

A.  I went down to Mr. Zechman.

. . . .

A conference was held on January 14, 1976 concerning this incident attended by Respondent, administrators and the President of the Board. Respondent alleged that it was the student who broached the subject of spanking and further it was she who had made a sexual proposition to him in order to reacquire the note. Respondent admitted at this time that he had had sexual fantasies about spanking girls from 1970 up to and including the time of these two incidents. On January 20, 1976, the School Board notified Respondent he was being suspended with pay pending a hearing on charges of mental derangement and immorality based on his conduct with these two students. At the hearing, the charge of mental derangement was dropped. Respondent, again admitting the existence of these fantasies, testified that after the second

Q. When did you do that?

A. Tuesday.

Q. The following day? For what purpose?

A. To explain to him about what happened.

. . . .

Q. What happened as a result of your meeting with Mr. Zechman?

A. He told me to say I wasn't allowed to wear a dress, and that I was to tell him if he didn't give me the letter back I was going to go down and tell Mr. Zechman.

Q. Did you go down to see Mr. Urso and tell him that?

A. Not until Wednesday came along, and I was going to his class, and he said, 'What is the matter with you?' I said, 'I am not going to go through with it.' He said, 'Why not?' I said, 'Because I don't want to.'

. . . .

A. He said, 'Well, did you tell anybody about this?' . . . I said, I told my brother. . . .

'[H]e said, well, did your brother change your mind or did you change it?

I said, 'Well, he told me what he thought, and I thought it over, and I wasn't going to go through with it.' Well, he said, 'If this thing does get out,' he said, 'are you going to leave me holding the bag?'

incident they had become repulsive to him, but asserted it was impossible for him to predict his ability to control these fantasies in the future. Evidence and testimony was also presented showing that prior to these two incidents Respondent had an exemplary record for all of his nine-year career as a teacher.

We are asked in this appeal to consider: (1) whether the Secretary erred in concluding that there was not substantial evidence in the record to support a finding of immorality under Section 1122 of the Code; and (2) whether the Secretary erred in holding that findings of fact and a statement of reasons must accompany the decision of the school board when dismissing a professional employee. Because we find the Secretary to be in error on both grounds, we reverse.

With respect to the Secretary's finding on the charge of immorality, we find it necessary to review first the definitional standard of immorality used by the Secretary, characterized as a course of conduct that rises to the level of a " 'grievous assault' upon the mores of the community." We conclude that this definition went beyond the standard of immorality in Section 1122 of the Code, judicially defined by our Supreme Court in *Horosko v. Mount Pleasant Township School District,* 335 Pa. 369, 372, 6 A.2d 866, 868, *cert. denied,* 308 U.S. 553 (1939), as "a course of conduct as offends the morals of the community and is a bad example to the youth whose ideals a teacher is supposed to foster and elevate." The Secretary asserts a more stringent standard of a "grievous assault" on community mores is necessary in this case because the Respondent's conduct, as speech alone, was at least partially protected by his First Amendment rights. We cannot agree. When speech is likely to incite or produce imminent deleterious effects on the educational process, such speech, like obscenity, is not protected by the First Amendment. *See Acanfora v. Board of*

*Education*, 359 F. Supp. 843 (D.C. Md. 1973), *aff'd*, 491 F.2d 498 (4th Cir.), *cert. denied*, 419 U.S. 836 (1974).

Having concluded that the Secretary erred in defining the standard of immorality applicable under Section 1122 we must consider whether the Board's determination was supported by substantial evidence so as to justify its conclusion that Respondent's conduct was immoral within the meaning and context of Section 1122. A finding of the school board that a professional employee was guilty of offending the moral standards of the community by his actions will not be disturbed on appeal when supported by substantial evidence. *Baker v. School District of City of Allentown*, 29 Pa. Commonwealth Ct. 453, 371 A.2d 1028 (1977). Such substantial evidence necessary to justify dismissal is determined by whether a reasonable man acting reasonably might have reached the same decision reached by the Board. *Landi v. West Chester Area School District*, 23 Pa. Commonwealth Ct. 586, 353 A.2d 895 (1976). It is apparent in view of the entire record that the Board chose to accept the testimony of the two students as to what was said to them rather than Respondent's version. The Board, as the only fact-finder with respect to these two incidents, and the only tribunal having the only opportunity to hear first-hand the testimony of both students and Respondent, resolved the issue of credibility against Respondent.[4]

It is true, as Respondent suggests, that he cannot be found guilty of immorality based solely upon his admitted fantasies. But in our view, the question of

---

[4] The record of the hearing before the hearing examiner on appeal to the Secretary of Education held on April 29, 1976 shows testimony relating solely to whether the Respondent received a fair and impartial hearing at the school board level. Neither of the two students testified at this hearing.

Respondent's fantasies is not at issue. What was judged by the Board was Respondent's conduct with these two students. Having chosen, as the Board did, to accept the students' versions of the incidents we cannot say the Board lacked sufficient evidence to reach the conclusion it did. The evidence shows that two students on two separate and totally unrelated occasions complained to their high school principal about Respondent's conduct which both perceived as sexual in nature. In the final incident which precipitated these charges Respondent's discussion with the student was explicitly sexual in nature.

Discussion of sexual subjects is a matter of particular sensitivity in society in general and when such discussion becomes a part of a course of conduct by an individual such conduct may be perceived by others as either amoral or immoral. When such matters are discussed with school age children, society, and particularly the parents of such children, become more acutely concerned both because such discussions can cause psychological harm and because children may view such conduct as a desirable example to follow. Where *teachers* engage in such discussions with children the problem is exacerbated because of the significant influence teachers exert over the intellectual, moral and psychological development of children. Where a teacher engages in such discussions outside the context of a classroom or a pedagogical setting, a school board, viewing these actions against the moral standards of the community, might well conclude that such conduct exceeds the bounds of propriety and fails to give students the proper guidance as to morals and standards of conduct which teachers should foster and encourage in their students. Such a finding is all that is necessary to deprive a teacher of the privilege of teaching children on the grounds that his conduct offended the moral standards of the community and set

a bad example to the youth under his charge. *See Horosko, supra.*

We turn next to the question of whether the Secretary erred in concluding that findings of fact and a statement of reasons must accompany the decision of a school board when dismissing a professional employee. Section 1130 of the Code does not provide that such findings or reasons must be made when a professional employee is dismissed although such findings are required when a non-tenured employee is dismissed and seeks a hearing pursuant to the Local Agency Law.[5] In his opinion the Secretary determined that the procedures set forth in the Local Agency Law should be used as a standard for procedural fairness in dismissing a professional employee. We believe this contention has been impliedly rejected by this Court in *La Porta v. Bucks County Public Schools Intermediate Unit, No. 22,* 15 Pa. Commonwealth Ct. 566, 327 A.2d 655 (1974) where we held the procedures to be followed in the dismissal of a professional employee are determined by the provisions of the Public School Code rather than the Local Agency Law. While it is true, as the Secretary reasons, that such findings and reasons would facilitate review, a change in procedure explicitly set forth in the Code is properly the subject of the legislature rather than the Courts or the Secretary of Education.

Lastly, we consider a question raised by the Respondent that he did not receive a full and impartial hearing before the Board. This issue was raised on appeal to the Secretary but was not discussed in the Secretary's opinion. However, this record could not support a finding that he did not receive such a hearing. As the Court stated in *Spruce Hill Township*

---

[5] Act of December 2, 1968, P.L. 1133, *as amended,* 53 P.S. §11301 et seq.

*School District v. Bryner,* 148 Pa. Superior Ct. 549, 25 A.2d 745 (1942):

> The making of the charges presupposes that the members of the board had some knowledge of the facts upon which the charges were based. . . . That a member of the board had an opinion at the time the charges were preferred . . . would not disqualify him from participating in a hearing on those charges, or invalidate the proceedings. We do not think that anything more was required of members of the board than that they could hear and determine . . . evidence given before them, uninfluenced by other previous impressions.

*Id.* at 556, 25 A.2d at 748.

After a careful review of the records of the hearings before the Board and the Secretary the conclusion must be that there was insufficient evidence to show that any school board member's opinion was fixed or unchangeable or that such an opinion dictated the result of the Board's deliberations. At most the record shows Respondent was not permitted to question a school board member under oath concerning what individual or persons he talked with prior to the Board instituting charges. However, this Board member also asserted at the hearing that he had not prejudged the charges against the Respondent.[6]

---

[6] The record of the school board hearing reflects this passage concerning possible bias:

Mr. Levy (Representing the Board) : Have you reached any opinion as to whether or not the charges brought against Mr. Urso should be sustained or should not be sustained?

Mr. Grimes : Absolutely not.

Mr. Levy : And, will your judgment be based solely, upon the evidence presented in this proceeding, before you and other members of this School Board, sir?

Mr. Grimes : Yes sir.

Accordingly, we will enter the following

ORDER

AND Now, February 8, 1978, the order of the Acting Secretary of Education, dated March 2, 1977, No. 288 is hereby vacated, and the decision of the Board of School Directors of the Penn-Delco School District, Delaware County, terminating the contract of Thomas J. Urso, dated February 5, 1976, reinstated.