**Roy WOOD et al., Plaintiffs,**

**v.**

**Frederick Corbet DAVISON, Individually and as President of the University of Georgia, et al., Defendants.**

**Civ. A. No. 17396.**

United States District Court, N. D. Georgia, Atlanta Division.

Dec. 7, 1972.

Sandy McCormack, Lowry, Henritze & McCormack, Athens, Ga., for plaintiffs.

Arthur K. Bolton, Atty. Gen., H. Andrew Owen, Jr., Asst. Atty. Gen., Atlanta, Ga., for defendants.

SIDNEY O. SMITH, Jr., Chief Judge.

## I.

This action was brought following denial of use of University of Georgia facilities for a conference and dance to be sponsored by the Committee on Gay

Education.[1] Plaintiffs are students at the University of Georgia and members of the Committee on Gay Education, a homosexual group whose purpose is to provide information about homosexuality. The Defendants are various administrative officials of the University of Georgia, a state-supported educational institution, and members of the Board of Regents of the University System of Georgia. The conference and dance for which facilities were denied were scheduled for November 11, 1972, the complaint and motion for a Temporary Restraining Order were filed on November 9, 1972, and a hearing was held on November 10, 1972. By agreement of the parties, the hearing was made a final hearing on the merits under Fed.R.Civ. P. 65 and an Order was issued restraining the denial of facilities. This opinion will provide final disposition of the cause.[2]

The Committee was formed in the school year of 1971–72 and sought recognition as a student organization under then existing procedures that required University "approval" of organizations. On May 10, 1972, the Committee, while still seeking recognition, sought and secured a Temporary Restraining Order from the Superior Court of Clarke County to allow a dance scheduled for that date. During the summer other social events were held by the Committee, all passing without incident.

When school opened this fall, University officials instituted a new student organization scheme calling for "registration"[3] rather than the previous "recognition" framework, the Committee duly registered, and on September 28, 1972, began scheduling activities for the Fall Quarter. They requested facilities, which the University makes available on a "priority" basis to registered student organizations,[4] for a regional conference to organize a Southeastern homosexual organization and dance. Nearly a month later campus officials denied the request for the conference and dance in a letter dated October 23, 1972, set forth fully in the margin.[5] Plaintiffs exhausted their administrative remedies

1. The complaint is based on 42 U.S.C. §§ 1983, 1985 (1970). This court has jurisdiction under 28 U.S.C. § 1343(3) (1970).

2. Plaintiffs sought actual and punitive damages of over a million dollars, but these damage claims have been waived by plaintiffs.

3. Rules and Regulations of the University of Georgia regarding Student Organizations require that organizations register annually and submit to the University the following information:
   (1) The name of the organization.
   (2) Name, address and phone number of the chief officer.
   (3) Name, address and phone number of faculty advisor.
   (4) A list of not more than three student officers authorized to reserve space, encumber funds or request services.
   (5) Statement of purpose of the organization.
   (6) Schedule of meetings and programs.
   (7) Requirements of membership.
   The Rules and Regulations further provide that "registration or any of the privileges accompanying registration may

be denied any group only as a penalty assessed by the student judiciary."

4. University of Georgia "Regulations Regarding Authorized Use of University Facilities" provides that:
   "3. University facilities shall be allotted on a 'first come' basis as long as there are facilities available."

5. "Dear Mr. Wood: The requests of the Committee on Gay Education to use facilities of the University on the date of November 11, 1972, are denied. The University recognizes the rights of individual students to express opinions and assemble peaceably. The University's primary mission is education and strives for this in the areas of teaching and learning, research, and service. Activities which dilute this effort or do not seem to promote the general well being of the University and its personnel must be considered carefully.
   The particular activities for which facilities are requested are not encompassed in the purpose of the University and introduce an element which is believed to be not in the best interest of the University. The activities seem to

by appeal to the Board of Regents, who refused on November 8, 1972, to reverse the decision of the University officials.[6]

## II.

■ Plaintiffs contend that the Defendants' denial of University facilities is an infringement on their first amendment rights of freedom of speech, assembly and association. The court agrees.

■ Although University administrators once had an almost unrestricted power to deal with students under the theory of *in loco parentis*, it is now clear that constitutional restraints on authority apply on campuses of state supported eductional institutions with fully as much sanction as public streets and in public parks. Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961); Wright, The Constitution on the Campus, 22 Vanderbilt L.Rev. 1027 (1969).

■ In Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) the Supreme Court dealt explicitly with this concept stating that it "can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the school house gate." *Id.* at 506, 89 S.Ct. at 736. In addition to protection of "pure" and "symbolic" speech the first amendment protects rights of assembly, De Jonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937) and association, NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed. 2d 796 (1957).

It is in this context that the right of a student organization to be recognized or to have access to University facilities should be considered. Based upon the first amendment, courts have required officials of institutions of higher education to recognize certain student organizations. University of Southern Mississippi Chapter of MCLU v. University of Southern Mississippi, 452 F.2d 564 (5th Cir. 1971); ACLU of Virginia, Inc. v. Radford College, 315 F.Supp. 893 (W.D.Va.1970); and Associated Students of Sacramento State College v. Butz, Civil No. 200795 (Super.Ct. Sacramento, California, February 15, 1971). (Recognition of homosexual organization.)

The Supreme Court has recently addressed the question of student organizations and their right to exist on a college campus. Healey v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). In this case the University of Connecticut had denied recognition to a local chapter of the Students for a Democratic Society (SDS). The court found that denial of University recognition affected first amendment rights of the SDS members and held that recognition could be denied only under narrowly limited circumstances.

The issue in *Healey* was recognition whereas the issue in the present case is access to University facilities. However, this distinction does not diminish the applicability and import of *Healey* to

---

go beyond and conflict with the educational purpose in apparently promoting and encouraging acts contrary to state law. Sincerely, William D. Powell, Director, Student Activities/University Union."

6. The Board of Regents undertook to resolve this issue when it was placed before it in the form of an appeal. According to the normal policies of the Board, a committee was appointed to hear the appeal which hearing was scheduled for November 24, 1972. Of course, since this was after the proposed dance any resolution of the issue would be too late, and it was necessary for plaintiffs to seek relief in this court.

the case at bar. The Court there determined that denial of facilities was the primary means by which the organization members' freedom of expression was infringed as evidenced in the following statement:

"The primary impediment to free association flowing from nonrecognition is the denial of use of campus facilities for meetings and other appropriate purposes." Id. at 189, 92 S.Ct. at 2346.

■ At this juncture it should be clearly understood that this ruling is not designed to and it should not be interpreted as limiting the University's control over its campus and facilities. A college or university has the right to adopt and enforce reasonable, non-discriminatory rules and regulations governing the utilization of its facilities. Bayless v. Martine, 430 F.2d 873 (5th Cir. 1970); Esteban v. Central Missouri State College, 415 F.2d 1077 at 1089 (8th Cir. 1969) cert. den. 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548. The control exercised by the administrative officials, though, must conform to the Constitution and laws of the United States. Such conformity dictates equal application of reasonable and unambiguous regulations.[7]

Thus, the issue presented to this Court is upon what grounds may University officials base a denial of University facilities to an organization which has complied with all the applicable University regulations.

■ This Court has been able to glean from the cases only three circumstances under which university facilities may be denied to a registered campus organization: (1) refusal to abide by reasonable regulations, (2) a demonstrated danger of violence or disruption

at the meeting, and (3) that the meeting itself would violate either state or federal law. See Blasi, Prior Restraints on Demonstrations, 68 Mich.L.Rev. 1482 (1970).

(1) The first basis for withholding facilities was enunciated in *Healey*. The Supreme Court determined that a university may impose certain "reasonable standards respecting conduct" on an organization's activities, and recognition could be denied if that organization refused to abide by such standards. *Healey*, 408 U.S. at 193, 92 S.Ct. 2338. In the present case, the University requires any organization applying for campus facilities to sign a statement that it will comply with all University rules and regulations. The Committee has agreed to do so, and the University has not established that the Committee will do otherwise.

(2) The second ground upon which denial of facilities can be based has received judicial condonation under several names. For instance, the Court in *Tinker* stated that actions are prohibitable which "materially and substantially disrupt the work and discipline of the school." 393 U.S. at 513, 89 S.Ct. at 740. However, there must be substantial evidence to warrant the conclusion that violence or disruption will erupt if a particular activity is allowed to take place on campus. In short, there must be objectively demonstrated a "clear and present danger" of violence before refusal can be bottomed thereon. See generally Gregory v. Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) (concurring opinion); Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). The Court in *Healey* found that there was insufficient evidence to indicate that the SDS would be a disruptive influence on campus. The

7. The University of Georgia has submitted to the court a pamphlet containing some of the regulations regarding the registration of student organizations and the procedures by which an organization can utilize campus facilities. Although in-

complete at this time, the regulations set forth in this pamphlet appear to be reasonable and constitute a foundation upon which to structure more complete regulations.

only indication of impending violence was the unsubstantiated fear of University officials which "constituted little more than the sort of 'undifferentiated fear or apprehension of disturbance [which] is not enough to overcome the right to freedom of expression.' [citing Tinker]" *Id.*, 408 U.S. at 191, 92 S.Ct. at 2351.

In the case before us, there likewise has been presented no evidence which indicates violence and disruption might evolve from the activities proposed by the Committee. To the contrary, two dances such as requested here have been sponsored previously with no violence accompanying them in any way.

(3) The third and final justification that the University might offer for denial of facilities is that the meeting itself might be unlawful. Sellers v. Regents of University of California, 432 F.2d 493 (9th Cir. 1970). If a meeting did contemplate criminal activity, then the University could deny facilities. For example, a group organized to advocate legalization of drugs could meet to discuss legitimate means of repealing drug laws, but it could not conduct a "smoke in" or "shoot in." Again the University requires a statement from the sponsoring organization that it will comply with all federal and State laws, and the Committee signed such a statement. The University stipulated that it had no evidence that the meeting for which facilities had been requested by the Committee would result in any activity which in itself would be illegal under existing state or federal law.

■ The invoking of any justification for denial amounts to a prior restraint on first amendment freedoms that places a "heavy burden" on the University to justify denial. *Healey*, 408 U.S. at 184, 92 S.Ct. 2338, 33 L.Ed. 2d 266. Should the University choose to deny facilities on these grounds or the basis that applicable rules and regulations have not been followed, it must inform the requesting organization of its decision within a reasonable time prior to the date planned for the activity. It should also provide the organization with the grounds upon which the decision was based. If the irregularity can be cured, the organization should be so informed and provided an opportunity to eliminate the basis of the denial. There should also be provided some framework within which the organization might be heard concerning the grounds for denial. This need not be a constitutional full-blown adversary proceeding with an elaborate appellate process, but only some reasonable opportunity for the organization to meet the University's contentions. "Notice and an opportunity to be heard" should suffice in such an instance. Cf. Dixon v. State Board of Education, 294 F.2d 150 (5th Cir. 1961).

Of course, if after approval, but during the activity or immediately prior to the activity, it becomes apparent that one of the above bases for denial will transpire, the University need not sit idly by while trying to prepare a notice to the organization denying access to the facilities. The University can and should take immediate summary steps to curtail violence and disruption, criminal activity, or conduct proscribed by applicable University rules and regulations.

Turning briefly to the reasons for denial presented by the University in the present case, it is apparent that these defendants acted out of a desire to preserve the integrity of the University as they know it. The president testified that he considered such activities as proposed by the Committee to be not within the best interests of the University community. It is of course the concern of every college official to maintain an academic environment on his campus that is conducive to intellectual pursuits. However, these officials no longer make decisions that go unnoticed by citizens outside the college community or that go unchallenged by those within that community. University presidents have the unenviable task of trying to maintain a

precarious balance between the rights of members of the academic community and the wishes of the taxpayers and alumni who support that community. Nevertheless, it is not the prerogative of college officials to impose their own preconceived notions and ideals on the campus by choosing among proposed organizations, providing access to some and denying a forum to those with which they do not agree.

As noted by the Supreme Court in *Tinker:*

"In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." 393 U.S. at 509, 89 S.Ct. at 738, 21 L.Ed.2d 731.

The court in *Healey* specifically rejected the notion that recognition could be denied by campus officials because an organization's philosophies are "counter to the official policy of the college." 408 U.S. 169, 187, 92 S.Ct. 2338, 2349, 33 L. Ed.2d 266 (1972).[8]

Since none of the reasons advanced by Defendants for denial of facilities to the Committee are constitutionally sufficient, plaintiffs are entitled to the relief prayed.

This *memorandum opinion* is filed in support of the injunction already entered.

It is so ordered.

---

8. President Davison also expressed some concern over the fact that the plaintiffs hoped to have conferees from other schools in attendance and there is likewise legitimate concern over non-student "outsiders". There is evidence in the record showing that other regional and national conferences have been conducted on the University campus with speakers and conferees from throughout the United States. Should the University desire in the future to restrict its facilities only for the use of students on its campus or students from the state of Georgia or elsewhere, rules and regulations to this effect could be adopted so long as they were uniformly applied to all groups. Under such a set of regulations, however, the University could not allow any non-students on campus for conferences and might thereby defeat the interests of the state in having continuing adult education. The choice is simply between barring all non-students from campus meetings on the one hand and allowing student sponsored groups with outside participants on the other hand; or restricting some facilities to one purpose or another.