## GAY STUDENTS ORGANIZATION OF the UNIVERSITY OF NEW HAMPSHIRE, et al.

v.

**Thomas N. BONNER, Individually and as President of the University of New Hampshire, et al.**

Civ. A. No. 73-279.

United States District Court,
D. New Hampshire.

Jan. 16, 1974.

Richard S. Kohn, New Hampshire Civil Liberties Union, Concord, N. H., for plaintiffs.

Joseph A. Millimet, Devine, Millimet, Stahl & Branch, Manchester, N. H., for defendants.

## OPINION

BOWNES, District Judge.

This civil rights action arises out of the denial by University of New Hampshire officials of the right of the Gay Students Organization (hereinafter GSO), a homosexual organization, to hold "social functions." The GSO claims that the denial violates its First and Fourteenth Amendment rights and requests that this court adjudicate and declare its rights to organize and function on the University campus. Although a similar declaratory action has been filed in the state court by the University Trustees,[1] counsel for the University has joined in the request that this court grant declaratory relief. Jurisdiction is based on 42 U.S.C. § 1983, 28 U.S.C. § 1343, and 28 U.S.C. §§ 2201, 2202.

Originally this case was set down for hearing on a petition for a preliminary injunction. After the first hearing on the preliminary injunction, both parties agreed that the hearing could be considered a final hearing on the merits. Rule 65 Fed.R.Civ.P. A short time after the hearing, defendant requested an opportunity to introduce additional evidence. The request was granted, and another hearing was held. At the conclusion of that hearing, counsel for both sides still agreed that a decision on the permanent injunction should be reached and that the court should address itself not only to the immediate question of whether or not the GSO could be prohibited from engaging in social functions, but also to the constitutional aspects of the University's power to regulate the GSO, with particular reference to the circumstances under which recognition and/or access to University facilities could be denied or withdrawn.

## I. FACTUAL BACKGROUND

The GSO was organized and officially recognized as a student organization in May of 1973. The normal recognition procedure was followed. *Cf.* September 9, 1973 Supplement to Student Handbook, Pl.'s Ex. G. At that time the GSO filed a Statement of Purposes, which ap-

---

[1]. On November 21, 1973, the University of New Hampshire filed a declaratory judgment action in Strafford County Superior Court. Service was made on the GSO on November 28, 1973. The GSO filed this action on November 29, 1973. Since both actions are *in personam*, both courts have concurrent jurisdiction to proceed simultaneously. 1A

Moore's Federal Practice (2d ed. 1965), ¶ 0.219 at 2601; ¶ 0.221 at 2605; ¶ 0.202 at 2025. Moreover, since the case involves serious constitutional questions, and since the action has proceeded posthaste in this court at the urging of both parties, sound discretion does not dictate that I await a result in the state court.

pears in the margin.[2] On November 9, 1973, the GSO sponsored a dance on campus. This function was held without incident. There were no official complaints about the dance, and no evidence was adduced to show that improper or illegal activities had taken place. After the dance, there was criticism by the Governor of New Hampshire, who complained to the University about the propriety of allowing such a "spectacle." And on November 10, 1973, the Board of Trustees issued a "Position Statement" which noted the "continuing public and [executive] committee concern" with the GSO. The Trustees voted to get a conclusive determination of the "legality and appropriateness of scheduling social functions by the Gay Students Organization" and "directed that in the interim the University administration would schedule *no further social functions* by the Gay Students Organization until the matter is legally resolved." Pl.'s Ex. 1 [Emphasis added.]

Thereafter, the GSO asked for permission to sponsor an on-campus play on December 7, 1973, and to have a social function following the play. The GSO was granted the right to put on the play, but permission for a social function following the play was denied.[3] *See* letter to Wayne April, President, GSO, from Michael O'Neil, Director, Recreation and Student Activities, dated November 21, 1973. Complaint, Appendix II. On December 3, 1973, the GSO brought a petition for a temporary restraining order asking that the Trustees be enjoined from prohibiting the social

function following the play. The temporary restraining order was denied on the ground that there was no evidence of irreparable harm.

The play was presented on December 7th as scheduled. Although the play itself caused little comment, there was some reaction to "Fag Rag Five" and "Fag Rag VI," two "extremist homosexual" publications which were distributed sometime during the evening. Much of the University's three witnesses' testimony centered on the GSO's role in the distribution of these publications. Richard Stevens, Vice Provost of student affairs, testified that, although he attended the play, he arrived too late to observe any distribution of the publications in question. Michael O'Neil, Director of Recreation and Student Activities, testified that the GSO asked his permission to sell the publications. This permission was denied by O'Neil, on the ground that the organization had not received a permit to sell publications. *See* Student Handbook Rule 11.14(s), Pl.'s Ex. G. The president of the GSO then asked for permission to distribute the two publications. After a cursory examination of the publications, O'Neil denied permission on the ground that the distribution would not be in the best interest of the University. Then, at O'Neil's request, the publications, which were on a table at the entrance to the theatre, were taken away and, according to O'Neil, he saw no further attempts at distribution.

Allen R. Bridle, a student trustee of the University, was the only University

2. On April 4, 1973, the GSO filed the following Statement of Purposes:

1) The primary purpose of the UNH Gay Students Organization is to promote the recognition of gay people on campus and to form a viable organization through which bisexual and homosexual people may express themselves.
2) Through this organization social functions will be organized in which both gay and straight people can learn about the others' thoughts and feelings concerning sexuality and sexual roles.
3) In an effort to educate the public about bisexuality and homosexuality, this organi-

zation will attempt to affect social changes through public relation measures such as guest lecturers, free literature, films, newspaper articles and radio programs.
4) Not the least important reason for establishing a gay organization is to give bisexual and homosexual members of the college community a place to communicate with each other and form discussion groups so that a healthy gay consciousness can evolve among students.

3. The GSO was, however, permitted to hold a meeting following the play.

witness to observe any distribution of the publications, either by GSO members or others. Bridle testified that he was handed a copy of Fag Rag VI by Louis Kelly, Secretary-Treasurer of the GSO, who was taking tickets and handing out programs when Bridle arrived. Although Bridle testified that he arrived well before the play began, he saw no one else hand out the publications, nor did he see Mr. Kelly hand the literature in question to anyone else. Kelly took the stand and stated that the GSO did not advocate this type of extremist shock literature. He testified that the Fag Rag literature was brought to the play by members of the Fag Rag staff, persons over whom the GSO had no control. Kelly emphatically denied having ever given anyone a copy of Fag Rag VI, but did admit that some copies may have been distributed inside the theatre by members of the Fag Rag Organization who had brought the magazines with them from Boston. In addition, a letter from Philip S. Dunlap to Governor Thompson, dated December 21, 1973, Pl.'s Ex. E, makes it unclear whether Bridle himself was ever handed a copy of the publication.[4]

 Aside from the literature which was handed out, very little objectionable activity occurred at the play. There was no evidence that the play was objectionable, although Bridle disagreed with its theme. Bridle testified that he observed "hand-holding" and "hugging" by members of the same sex, but Stevens saw nothing which was violative of Student Handbook Rule 10.2[5] or which interfered with the University's mission of education. In characterizing the GSO's handling of the distribution incident, O'Neil testified that Wayne April, President of the GSO, had acted responsibly in promptly following his instruc-

tions to remove the publications from the theatre. On this view of the evidence, I cannot help but conclude that no University of New Hampshire students were responsible for the distribution of the publications at the play.

After the play, the Governor of New Hampshire wrote an open letter to the Board of Trustees, wherein he stated:

> Therefore, after very careful consideration, I must inform you the trustees and administration that indecency and moral filth will no longer be allowed on our campuses.
>
> I am not interested in legalistic hairsplitting that begs these important issues.
>
> Either you take firm, fair and positive action to rid your campuses of socially abhorrent activities or I, as governor, will stand solidly against the expenditure of one more cent of taxpayers' money for your institutions.
>
> Translated simply, that means that unless you take successful corrective action before the capital budget is reconsidered, I shall oppose the inclusion of any money therein for the University and will veto that budget, if necessary. Pl.'s Ex. E dated December 15, 1973.

Shortly thereafter, on December 17, 1973, Dr. Bonner, President of the University, issued a public statement which condemned the distribution of the Fag Rag literature, ordered an "immediate investigation" to establish responsibility for the distribution, and declared:

> I am today serving notice on the Gay Students Organization that any repetition of the offending behavior of December 7, 1973 will result in my seeking its immediate suspension as a student organization until the courts have acted on the several issues in-

---

4. The letter stated:
 In talking with Allen Bridle today I understand that a student did hand Miss Bartlett, Allen's friend, a copy of the paper.

5. Rule 10.2 reads in pertinent part:
 The University has the right to expect that students, as members of the academic community, will conduct themselves in ways which are consistent with the educational mission of freedom to learn. Student Handbook, Pl.'s Ex. G at 74.

volving GSO now before them. The organizations will be held fully responsible for any ancillary activities carried on by those attracted from other places to a GSO event.[6]

I have ordered that the current Trustee ban on GSO social functions be interpreted more strictly by administrative authorities than had been the case before December 7, 1973. Pl.'s Ex. F.

This declaration tightened the restrictions on the GSO's activities, specifically indicating that the ban on social functions would henceforth be interpreted more expansively than it had in the past.

## II. THE LEGAL SETTING

In recent years students have more militantly asserted their rights, and this case involves yet another confrontation between a group of university students and university officials and trustees. With the lowering of the age of majority to eighteen, the *in loco parentis* rationale for vesting unbridled discretion in university officials is no longer tenable. Wood v. Davison, 351 F.Supp. 543, 546 (N.D.Ga.1972). One commentator has suggested that the average student is more than twenty-one years old and "is surely an adult," C. A. Wright, The Constitution on the Campus, 22 Vand.L. Rev. 1027, 1052–53 (1971); and Vice Provost Stevens testified that at the University of New Hampshire no more than 200 to 250 of 8,900 students are under the age of eighteen. Moreover, the demise of the privilege concept of education at public universities is clearly upon us. University of Southern Mississippi Chapter of Mississippi Civil Liberties Union v. University of Southern Mississippi, 452 F.2d 564, 565 (5th Cir. 1971); Note, Students' Constitutional Rights on Public Campuses, 58 Va.L.Rev. 552, 552–55 (1972).

■ Although these developments have eroded the university's once "almost unrestricted power to deal with

students," Wood v. Davison, *supra,* 351 F.Supp. at 546, university officials must still be accorded a fair degree of discretion in handling day-to-day affairs in the university community. However, this discretion must be exercised in light of the "special characteristics of the school environment." Tinker v. Des Moines School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). As the Supreme Court has said:

The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960).

and

The essentiality of freedom in the community of American universities is almost self-evident. . . . Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die. Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957).

*See Tinker, supra,* 393 U.S. at 506–507, 89 S.Ct. 733; *University of Southern Mississippi MCLU, supra,* 452 F.2d at 564; Brooks v. Auburn University, 296 F.Supp. 188 (M.D.Ala.), *affm'd,* 412 F. 2d 1171 (5th Cir. 1969).

■ Given the importance and delicacy of the educational mission, courts are loath to become embroiled in the internal machinations of student-administration disputes. However, the Constitution applies to college campuses, West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); *Tinker, supra;* Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1971); and where constitutional liberties are threatened, courts must not be afraid to enter the fray. Stacey v. Williams, 306 F.Supp.

---

6. *See* note 10 *infra.*

963, 969 (N.D.Miss.1969); Brooks v. Auburn University, *supra,* 296 F.Supp. at 192; Jervey v. Martin, 336 F.Supp. 1350, 1353 (W.D.Va.1972). *Cf.* Vigil v. Post Office Dept., 406 F.2d 921. 925 (10th Cir. 1969).

It is in this context that the rights of the GSO must be examined. I will first delineate the constitutional rights of the GSO, dealing with the First Amendment and Equal Protection Clause sources separately. Then I will consider the circumstances under which the University may restrict those rights.

## III. FIRST AMENDMENT RIGHTS

■ The fundamental rights of freedom of speech, assembly, and petition are, of course, explicitly set out in the First Amendment. Over the years, the Supreme Court has developed a constellation of First Amendment protections that emanate from these explicit guarantees. *See* Note, Freedom of Political Association on the Campus: The Right to Official Recognition, 46 N.Y.U.L.Rev. 1149, 1152–58 (1971).

> Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs. While the freedom of association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition. [Citing cases.] Healy v. James, 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1971).

That these rights are available to students is no longer questioned. *Tinker, supra,* 393 U.S. at 506, 89 S.Ct. 733; Healy v. James, *supra.*

■ Corollary to the development of these rights has been an extension of protection to those activities necessary to their proper exercise. Without protection for these implicit and inherent supportive activities, First Amendment rights would be hollow indeed. Illustrative of such supportive activity is litigation. When used in good faith, and for the advancement of an associational objective, litigious activity is a protected First Amendment right. N.A. A. C. P. v. Alabama, 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964); N.A. A. C. P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); A. C. L. U. of Va. v. Radford College, 315 F.Supp. 893 (W.D.Va.1970); *University of Southern Mississippi MCLU, supra.* In the context of labor relations, the Supreme Court has said that the right to organize

> comprehends whatever may be appropriate and lawful to accomplish and maintain such organization. Thomas v. Collins, 323 U.S. 516, 533, 65 S.Ct. 315, 324, 89 L.Ed. 430 (1945).

More recently, the Supreme Court has fleshed out students' First Amendment rights to association in the university setting.[7] Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1971), arose out of a denial by a state university of recognition to students who had organized a local chapter of Students for a Democratic Society. In holding that the unjustified denial abridged their First Amendment rights to free association, the Court said:

> The primary impediment to free association flowing from nonrecognition is the denial of use of campus facilities for meetings and other appropriate purposes. 408 U.S. at 181, 92 S.Ct. at 2346.

In addition, the Court noted the importance of the right to use the university media for expression of ideas and other

---

7. Although the dichotomy between political action organizations and social organizations is not well-defined, Note, Freedom of Political Association on the Campus: The Right to Official Recognition, 46 N.Y.U.L.Rev. 1149, 1158–61 (1971), it is important to point out initially that the GSO is, in fact, a polical action organization. Acanfora v. Board of Education, 359 F.Supp. 843, 856 (D.Md. 1973); *see* GSO's Statement of Purposes, note 2, *supra.* This is so because of the traditionally smaller degree of protection that courts have afforded purely social activities. Note, Freedom of Political Association on the Campus, *supra,* at 1158–61.

communication with the university community. Although it did not delineate the entire scope of rights incident to official recognition, the Court indicated that protection "is not limited to direct interference with fundamental rights." 408 U.S. at 183, 92 S.Ct. at 2347; *see* Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); and commentators have pointed to several other rights normally regarded as incident to the official recognition of an organization, to wit:

1. The right to request university funding;[8]

2. The right to establish dues and sponsor money raising events;

3. The right to use the university's name as part of the organization's name;

4. The right to invite guest speakers to speak on campus; and

5. Eligibility for university awards and honors.

 Practically then, Healy v. James means that, absent justification, a student organization may not be denied those rights which are necessary to its maintenance and orderly growth. In this case the GSO is certainly entitled to the rights of access to University facilities and media found to be protected by the First Amendment in Healy v. James. In addition, since the University itself has deemed them important, I hold that the GSO is also entitled to the five additional rights listed above as normally attendant on official recognition. *See* September 19, 1973 Supplement to Student Handbook, Pl.'s Ex. G. These rights include the right to sponsor and participate in social functions.

In granting the GSO the right to hold social functions as incident to its First Amendment rights of free associa-

tion, I am not alone. Wood v. Davison, 351 F.Supp. 543 (N.D.Ga.1972), involved an attempt by university officials to deny a gay student organization recognition and the right to hold a conference and dance. Referring to the Supreme Court's ruling in Healy v. James, *supra,* the court held that, absent certain well-defined justifications, the university could not deny the organization use of its facilities for these purposes. In so holding, the Court assumed, without explicit consideration, that the Healy v. James First Amendment associational right to "use of campus facilities for meetings and other appropriate purposes" included the right to hold a dance. I rule that Healy v. James does permit the extension of protection to dances and other social functions. Support for this position lies in the pervasive importance of social functions in the university setting.[9]

Before considering the GSO's Equal Protection claim, a point should be made clear. The University has *not* denied the GSO what may be termed its more traditional First Amendment rights. Thus, the GSO has so far been allowed to "meet for discussion of ideas and social change" and sponsor plays. Defts.' Memorandum of Law at 7. However, the scope of social functions intended to be proscribed by the University at the present time is not clear. I have assumed that the current proscription encompasses only purely social events, such as dances and parties. *See* letter from O'Neil to April, dated November 21, 1973, Complaint, Appendix II. But paragraph 4 of President Bonner's statement[10] of December 17, 1973, purports to enlarge the ambit of proscribed activities. If the current policy does reflect an even more restrictive ban on GSO activities, so as to include, for ex-

8. The Supreme Court was aware of the significance of the right to request university funding in Healy v. James, but chose not to consider the "associational aspect" of the right in the context of that case. Healy v. James, 408 U.S. 169, 182 n. 8, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1971).

9. This is particularly true for minority groups. *See* T. Emerson, The System of Freedom of Expression 286–87 (1970).

10. *See* text accompanying note 6, *supra.*

ample, a prohibition of the recently produced play, then the policy would, of course, be an even more flagrant abridgment of the GSO's more traditional First Amendment liberties.

## IV. FOURTEENTH AMENDMENT ARGUMENT

As the students' rights movement has gained momentum, judicial attempts to strike a balance between competing student and administration prerogatives have drawn largely on the First Amendment theory. Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1971). This is natural since many of the important contests have revolved around such rights as the right to organize, the right to be recognized, the right to hear speakers of their own choice, the right to demonstrate and otherwise express their ideas—all activities traditionally protected by the First Amendment.

Using a First Amendment approach, I have outlined above the constitutional prerogatives of the GSO. These organizational and recognitional rights stem from the basic guarantees of free speech and assembly, and they encompass the rights and privileges normally attendant thereon, including the right to freely associate at social functions. Healy v. James, 408 U.S. at 181–182, 92 S.Ct. 2338.

■ Although the students' rights cases have developed along First Amendment lines, many have involved, often almost *sub silentio*, Equal Protection underpinnings.[11] The speaker ban cases suggest that, although a university need not open its doors to outside speakers or activities,

once they are opened they must be opened under conditions consistent with constitutional principle [citing

cases]. Buckley v. Meng, 35 Misc.2d 467, 230 N.Y.S.2d 924, 933 (1962).

*See* Stacey v. Williams, *supra,* 306 F. Supp. at 974; Brooks v. Auburn University, *supra,* 296 F.Supp. at 194; C. A. Wright,. The Constitution on Campus, 22 Vand.L.Rev. 1027, 1050–52 (1969). Similarly, the demonstration cases, although allowing university officials greater discretion due to the more substantial "action" element they involve, call for evenhanded application of university rules and regulations. *Wright, supra,* at 1144; *see* T. Emerson, Toward a General Theory of the First Amendment 115 (1966). Finally, although the decision in Healy v. James was couched solely in ·First Amendment terms, lower federal court cases dealing with problems of recognition and access to university facilities make it clear that

[t]he actual issue is whether a state institution . . . can deny recognized status and whatever rights and privileges flow from that status to [one organization] when it has accorded that status to other organizations which have complied with the prescribed procedures. A. C. L. U. of Va. v. Radford College, 315 F.Supp. 893, 897 (W.D.Va.1970).

*Cf.* Merkey v. Board of Regents, 344 F. Supp. 1296, 1306–1307 (N.D.Fla.1972); *University of Southern Mississippi MCLU, supra,* 452 F.2d at 566, and *Brooks, supra,* 296 F.Supp. at 194.

In the past several years, the Supreme Court has applied a two-tier analysis to problems of Equal Protection. Triggering strict scrutiny have been cases involving a "suspect classification" or "fundamental interest." Absent either of the above, only minimal scrutiny, enough to establish any rational relation between the rule and its goal, has been necessary to sustain a regulation or statute. Of late, the Court has shown some

---

11. The University of New Hampshire, as a state organ, is clearly subject to the mandate of the Equal Protection Clause of the Fourteenth Amendment. West Virginia Board of Education v. Barnette, *supra,* 319 U.S. at 637, 63 S.Ct. 1178; Stacey v. Williams, *supra,* 306 F.Supp. at 975; Close v. Lederle, 303 F.Supp. 1109, 1111 (D.Mass. 1969), *rev'd on other grounds,* 424 F.2d 988 (1st Cir.), *cert. denied,* 400 U.S. 903, 91 S. Ct. 141, 27 L.Ed.2d 140 (1970).

dissatisfaction with this approach. G. Gunther, The Supreme Court 1971 Term, Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L.Rev. 1, 17 (1972). Recent cases suggest a more moderate approach to Equal Protection problems wherein the Court has looked to see if there is "an appropriate governmental interest suitably furthered by the differential treatment." Mosley v. City of Chicago Police Department, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972); Grayned v. City of Rockford, 408 U.S. 104, 92 S. Ct. 2294, 33 L.Ed.2d 222 (1972); U. S. Dept. of Agriculture v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). *See Gunther, supra,* at 11 n. 48. This formulation emphasizes the means-ends relation somewhat more than the two-tier approach, but the test has not yet been radically altered, *Gunther, supra,* at 11, and the Court has recently reiterated particular concern where Equal Protection claims are "closely intertwined" with First Amendment interests. *Mosley, supra,* 408 U.S. at 95, 92 S.Ct. 2286. In *Mosley,* a City of Chicago ordinance "exempt[ed] peaceful labor picketing from its general prohibition on picketing next to a school." 408 U.S. at 94, 92 S.Ct. at 2289. Without labeling picketing a fundamental interest or enunciating a strict scrutiny test, the Court held that, because of the First Amendment interests involved, "discriminations . . . must be tailored to serve a substantial governmental interest." 408 U.S. at 99, 92 S.Ct. at 2292. Rejecting the City's rationale that "non-labor picketing is more prone to produce violence than labor picketing," 408 U.S. at 100, 92 S.Ct. at 2293, the Court insisted that the ordinance be more "narrowly tailored" to the legitimate objective of preventing school disruption. The fatal flaw in the ordinance was that it described the impermissible conduct "not in terms of time, place, and manner, but in terms of [the] subject matter [of the conduct]." 408 U.S. at 99, 92 S.Ct. at 2292. This, it seems to me,

is precisely the flaw in the University's position in this case.

 Although the factual setting of *Mosley* is the converse of the GSO's case, the principle involved is the same. Moreover, *Mosley* relied on Fowler v. Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953). In *Fowler,* the City of Pawtucket denied Jehovah's Witnesses the right to use a park for church services, when "the ordinance, as construed and applied, did not prohibit church services in the park." 345 U.S. at 69, 73 S.Ct. at 527. *Fowler* is precisely analogous to the facts in this case, and, together with *Mosley,* stands at least for the proposition that a state authority must deal with similarly situated organizations in an evenhanded manner. As the Court in *Mosley* said:

> Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an "equality of status in the field of ideas," and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone. 408 U.S. at 96, 92 S.Ct. at 2290.

In short, the University may not censor expression because it does not like its content or message. *Tinker, supra,* 393 U.S. at 509, 89 S.Ct. 733, 21 L.Ed.2d 731; Healy v. James, *supra;* Wood v. Davison, *supra,* 351 F.Supp. at 548; *Wright, supra,* at 1039. *Cf.* Schneider v. Smith, 390 U.S. 17, 25, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968); Norton v. Macy, 135 U.S.

*rev'd*

App.D.C. 214, 417 F.2d 1161, 1165 (1969); McConnell v. Anderson, 316 F. Supp. 809, 814 (D.Minn.1970), *affm'd,* 451 F.2d, 193 (8th Cir. 1971), *cert denied,* 405 U.S. 1046, 92 S.Ct. 1312, 31 L.Ed.2d 588 (1972).

■ This case is permeated with First Amendment considerations, especially since the parties have asked for a declaratory judgment embracing the rights of the GSO in general. Healy v. James, *supra.* However, I do want to make it clear that, independent of these considerations, substantial Equal Protection questions inhere in the University's treatment of the GSO. Stevens, Vice Provost of student affairs, testified that the University has recognized and continues to recognize several campus "political action" groups. Among the organizations he mentioned were: The Black Student Union, WOMEN!, Students for a Democratic Society, and Young Alliance for Freedom.[12] Despite the fact that some of these organizations are committed to educational and political efforts similar to those of the GSO, none has been denied the right to hold social functions. *See* Fowler v. Rhode Island, *supra,* 345 U.S. at 70, 73 S.Ct. 526 (Frankfurter, J., concurring). To be sustained, this differential treatment must "rationally further some legitimate [University] interest." U.S. Dept. of Agriculture v. Moreno, *supra,* 413 U.S. at 533, 93 S.Ct. 2821, and, as will be seen from the ensuing discussion, the University cannot demonstrate such a relationship. *See* Wood v. Davison, *supra,* at 547; *cf.* Norton v. Macy, *supra,* 417 F.2d at 1166–1167; and McConnell v. Anderson, *supra,* 316 F.Supp. at 814.

## V. THE SCOPE OF PERMISSIBLE REGULATION

■ Regulation of student organizations and campus facilities by of-

ficials of a state university is subject to constitutional restraints. Where, as here, the exercise of First Amendment rights is affected, state regulation must be closely scrutinized to insure that the proscription against those "great . . . indispensable democratic freedoms" is as narrow as possible.[13] Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945); N.A.A.C.P. v. Button, *supra,* 371 U.S. at 438–439, 83 S.Ct. 328, 9 L.Ed.2d 405; A.C.L.U. v. Radford College, *supra,* 315 F.Supp. at 898; Jones v. State Board of Education, 279 F.Supp. 190, 203 (M.D.Tenn.1968), *affm'd,* 407 F.2d 834 (6th Cir. 1969), *cert. dism'd,* 397 U.S. 31, 90 S.Ct. 779, 25 L.Ed.2d 27 (1970).

> When the restriction upon student expression takes the form of an attempt to predict in advance the content and consequences of that expression, it is tantamount to a prior restraint and carries a heavy presumption against its constitutionality. [Citing cases.] University of So. Miss. M.C.L.U. v. University of So. Miss., 452 F.2d 564, 566 (5th Cir. 1971).

Healy v. James, *supra,* 408 U.S. at 183–184, 92 S.Ct. 2338, 33 L.Ed.2d 266; Wood v. Davison, *supra,* 351 F.Supp. at 548. Even if one views the denial of the right to hold social functions as outside the scope of First Amendment protection, recent trends in the Supreme Court indicate that a state university regulation challenged solely on Equal Protection grounds should be judged in the light of a relatively vigorous standard: "that [University] means must substantially further [University] ends." *Gunther, supra,* at 20. *See Mosley, supra; Moreno, supra;* and The Supreme Court, 1972 Term, 87 Harv.L.Rev. 57, 129–33.

■ Broadly speaking, there appear to be only three circumstances under

---

12. *See* Student Handbook, Pl.'s Ex. G, at 23–37.

13. I note, without deciding, the possibility that a ban on "social functions" may be vague and overbroad. *Compare* Sword v. Fox, 446 F.2d 1091, 1099–1100 (4th Cir.), *cert. denied,* 404 U.S. 994, 92 S.Ct. 534, 30 L.Ed.2d 547 (1971), *with* Soglin v. Kauffman, 418 F.2d 163 (7th Cir. 1969).

which a university may deny or withdraw recognition or the rights and privileges flowing therefrom from a student organization: (1) failure or refusal to abide by reasonable housekeeping rules; (2) "demonstrated danger of violence" or disruption of the university's educational mission; and (3) violation of the criminal law by the organization or by its members at a function sponsored by the organization. I will deal with them seriatim.

(1) The University's right to establish "reasonable regulations with respect to the time, the place, and the manner in which student groups conduct their speech-related activities" is clear. Healy v. James, *supra*, 408 U.S. at 192–193, 92 S.Ct. at 2352. Such rules could, for example, require an organization to file a statement of purposes and a list of officers, to apply for use of facilities in advance and by written request or to obtain a permit for the sale or distribution of materials. *See, e. g.*, Student Handbook, Pl.'s Ex. G, at 79–83. These "housekeeping rules" are as important to the smooth functioning of the university community as they are to the community at large, and failure to abide by them would be justification for official sanction.

In this case, the University does not allege that the GSO has failed to observe any University regulations. The testimony demonstrates that the organization was recognized according to normal procedure, and there is no evidence showing that the GSO has conducted its activities in a manner inconsistent with the University regulations.

■■■ (2) The University may protect itself against activity which materially and substantially disrupts the normal operations of the school, Tinker, *supra*, 393 U.S. at 513, 89 S.Ct. 733; Healy v. James, *supra*, 408 U.S. at 188–191, 92 S.Ct. 2338; *cf.* McConnell v. Anderson, 451 F.2d 193 (8th Cir. 1971); and it may establish rules and regulations to prohibit violence on campus. Merkey v. Board of Regents, *supra*. However, there must be "substantial evidence to

warrant the conclusion that violence or disruption will erupt" before recognition, or any of the incidents thereto, may be denied or withdrawn, Wood v. Davison, *supra*, 351 F.Supp. at 547; Healy v. James, *supra*, 408 U.S. at 188, 92 S.Ct. 2338, and such substantiality is not to be lightly presumed.

. . . [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); . . . . Tinker, *supra*, 393 U.S. at 508, 89 S.Ct. at 737.

In the present case, the University has submitted no evidence pointing to the imminence of violence or disruption on the campus caused by the GSO. As noted earlier, Vice Provost Stevens testified that at the play on December 7th, he saw nothing which was violative of the Student Handbook Rule 10.2 or which interfered with the University's mission of education, and Student Activities Director O'Neil testified that the GSO's President had acted "responsibly" at the play. In view of this uncontested testimony from the University's own witnesses and the absence of any other relevant evidence, I conclude that the GSO did not then, and does not now, represent a disruptive threat to the University of New Hampshire community.

■■■■ On another tack, however, the University maintains that Legislative and Gubernatorial disapproval of the GSO's activities threaten the school with reduced financial support in the form of either limited appropriations or a veto of this year's capital budget. *See* Pl.'s Ex. E, Letter to Mr. Philip Dunlap from the Governor, dated December 15,

1973. This, the University contends, constitutes a clear and present danger to its educational mission. I am not blind to the reality of these threats. However, financial retaliation against the University for maintaining a system mandated by the First and Fourteenth Amendments would be in reality an attempt to abridge the rights guaranteed by those Amendments. The basic purpose of the Bill of Rights is to protect the people against arbitrary and discriminatory use of political power. Schneider v. Smith, 390 U.S. 17, 25, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968). A state university may not be blackmailed into depriving its students of their constitutional rights.

(3) The University may, of course, deny recognition and use of campus facilities to organizations which consistently violate the criminal law. Wood v. Davison, *supra,* 351 F.Supp. at 548; Healy v. James, *supra,* 408 U.S. at 189, 92 S.Ct. 2338. In this regard, the University claims that GSO social functions are tantamount to criminal solicitation of deviate sexual relations, *see* NH RSA 632:2 and 629:2, that GSO members have distributed obscene material, and that GSO functions promote conduct which is obscene.

Homosexual sexual relations, as defined by NH RSA 632:2, are illegal in New Hampshire. Section IV of the statute specifically prohibits:

> any act of sexual gratification involving the sex organs of one person and the mouth or anus of another.

Solicitation of these relations is also illegal. However, the University does not allege, and the testimony at the hearing did not reveal, that activity as defined in NH RSA 632:2 was solicited or had occurred at any GSO functions. In fact, Kelly, an officer of the GSO, testified that the GSO did not advocate public homosexual acts.

NH RSA 650 makes the distribution of obscene material illegal in New Hampshire; and the University need not tolerate violations of this statute. Although it is clear from the evidence that allegedly obscene [14] copies of Fag Rag VI were "made available" within the meaning of NH RSA 650:2(III), I have ruled on the evidence before me [15] that the GSO was not responsible for this action. The magazines were distributed by members of the Fag Rag publishing staff, persons over whom the GSO had no control. Furthermore, Kelly testified that the GSO considered Fag Rag to be an "extremist shock paper" and that the GSO did not advocate or participate in the distribution of such material as a means of communicating their ideas.

■■ Since I have found that the GSO has neither distributed, nor plans to distribute, any obscene material, the University may not withdraw recognition from the GSO or limit its access to University facilities on this basis. Furthermore, President Bonner's ruling that the GSO

> will be held fully responsible for any ancillary activities carried on by those attracted from other places to a GSO event. Statement of President Bonner. PL.'s Ex. F, Par. 3.

cannot stand. Fundamental to our system is the idea that constitutional rights may not be denied simply because their assertion invites illegal conduct. Cox v. Louisiana, 379 U.S. 536, 550–552, 85 S.Ct. 453, 13 L.Ed.2d 471; Stacey v. Williams, *supra,* 306 F.Supp. at 977. Although both *Cox* and Stacey v. Williams deal with speakers' rights in the face of a hostile audience, the principle has application in the present context.[16]

---

14. For the purposes of this decision, it is not necessary to reach the issue of whether or not the material available at the December 7th play is obscene, and I express no opinion on that matter.

15. Vice Provost Stevens testified that the University was still conducting an investigation into the events surrounding the distri-

bution of materials at the play on December 7th. This decision in no way precludes University action based on new evidence turned up by that investigation.

16. It goes without saying that the GSO cannot be held responsible for inappropriately violent reactions to the proper exercise of their constitutional rights.

To extract a guarantee as a condition of assembling that no violation of law will be forthcoming, is to eliminate public assembly altogether. T. Emerson, The System of Freedom of Expression 288 (1970).

■ The University's final contention is that it may prohibit GSO social functions because they promote and facilitate indecent conduct, which if not a crime under NH RSA 632:2, is at least "offensive to a majority of the people of New Hampshire." Defts.' Memorandum of Law at 6–7. Such conduct, the University maintains, is subject to community standards under the Supreme Court's recent "obscenity-pornography" rulings. However, those cases are inapposite. They deal solely with obscene material—books, movies, photographs, pictures, and the like; none deals with conduct. Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed. 2d 446 (1973); Kaplan v. California, 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973); United States v. 12 200-Ft. Reels of Super 8mm Film, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); United States v. Orito, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973). The type of behavior alleged here to be offensive is controllable under NH RSA 645:1, which defines indecent exposure and lewdness as fornication, exposure of genitals or

> any other act of gross lewdness under circumstances which [the performer] should know will likely cause affront or alarm.

If members of the GSO are found to be violating this statute at social functions, such functions may be prohibited.

The statutory offenses discussed above need not be tolerated in the University community. However, such violations of the criminal law are usually dealt with by the civil authorities. The University has recognized this principle in Rule 10.3(s) of the Student Handbook, Pl.'s Ex. G, which provides in pertinent part:

the University has an obligation to see that its own facilities are not used for any unlawful purposes. It is not, however, a law enforcement agency but rather an institution concerned about the development and welfare of its students. Its authority shall not be invoked, therefore, merely to duplicate the civil penalties for misconduct. Only when misconduct poses a clear and present threat to the University's interest as an academic community shall the University invoke its own disciplinary authority.

In dealing with student conduct violative of the criminal law, the University must, of course, abide by its policy to resist community pressure and institute charges only where "its own interests as an academic community are distinctly and directly involved." *Id.*

## VI. SUMMARY

■■ In essence, this case is quite simple. The First Amendment guarantees all individuals, including university students, the right to organize and associate "to further their personal beliefs." Healy v. James, *supra*, 408 U.S. at 181, 92 S.Ct. 2338. Absent the attendance of well-defined circumstances, a university must recognize any bona fide student organization and grant to that organization the rights and privileges which normally flow from such recognition—those rights and privileges which are necessary to the maintenance and growth of the organization. Moreover, although a university may reasonably regulate the activities of student organizations, once it grants a particular privilege to one or more organizations, the Fourteenth Amendment requires that that privilege be available to all organizations on an equal basis. From this, it follows that the GSO has the same right to be recognized, to use campus facilities, and to hold functions, social or otherwise, as every other organization on the University of New Hampshire campus.

University officials must understand that

> mere disagreement . . . with the group's philosophy affords no rea-

**1102**

son to deny it recognition. . . .
The [University], acting here as the
instrumentality of the State, may not
restrict speech or association simply
because it finds the views expressed
by any group to be abhorrent. Healy
v. James, *supra*, at 187–188, 92 S.Ct.
at 2349.

Minority groups, as well as majority
groups, must be given an opportunity to
express themselves; for only in this way
can our system of peaceful social change
be maintained.

By this, I do not mean that the University must stand by while the GSO and its members incite violence, disrupt school activities, or commit crime. As the University must respect the rights of the GSO, so must the GSO respect the rights of the rest of the University community. This, in essence, is what the Constitution requires.

For the foregoing reasons, the defendants are herewith enjoined from prohibiting or restricting the sponsorship of social functions or use of University facilities for such functions by the Gay Students Organization. Defendants are further enjoined from treating the Gay Students Organization differently than other University student organizations.

So ordered.